STATE OF CONNECTICUT *v.* ERNEST FRANCIS
(14550)

PETERS, C. J., CALLAHAN, BORDEN, BERDON and NORCOTT, Js.

Argued September 23—decision released December 14, 1993

*Susan M. Hankins,* for the appellant (defendant).

*Judith Rossi,* assistant state's attorney, with whom, on the brief, were *John M. Bailey,* chief state's attorney, and *James E. Thomas,* state's attorney, for the appellee (state).

NORCOTT, J. The defendant, Ernest Francis, after a jury trial, appeals[1] from a judgment of conviction of murder in violation of General Statutes § 53a-54a (a).[2] The trial court sentenced the defendant to a term of fifty years imprisonment. The principal issue raised by the defendant is whether the trial court abused its discretion by precluding him from cross-examining a state's witness about her probationary status. In addi-

---

[1] The defendant appeals pursuant to General Statutes § 51-199 (b) (3), which provides: "The following matters shall be taken directly to the supreme court . . . an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[2] General Statutes § 53a-54a provides in relevant part: "MURDER. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

tion, the defendant claims that the trial court improperly denied his motion for a judgment of acquittal for insufficiency of evidence and improperly instructed the jury regarding: (1) the element of intent to kill; (2) evidence of a "guilty connection" between the defendant and the crime charged; and (3) the jurors' duty in returning a verdict. We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. On March 8, 1990, the defendant and the victim were incarcerated at the Hartford community correctional center. The two men became involved in an altercation during which the victim and several other inmates attacked the defendant. During the course of this altercation, the defendant was stabbed in his leg with a shank, a prison term for a homemade weapon. The defendant believed that it was the victim who had stabbed him. Both men were subsequently released from custody.

On August 12, 1990, the defendant and the victim met again. At approximately 4 p.m. on that day, two witnesses, Jennifer Green and Sandra Brown, were on the porch of Brown's residence at 165 Homestead Avenue in Hartford. At that time, they saw a young man, later determined to be the victim, walking toward them on Homestead Avenue, holding an "ice pop" in his hand. At the same time, two additional witnesses, Victor Lowe and Fred Faucette, were standing on the sidewalk of Homestead Avenue. They also noticed the victim.

All four witnesses then observed a red Mitsubishi automobile drive up Homestead Avenue, pass the victim, stop suddenly, back up and halt near him. The defendant then emerged from the driver's side of the car and approached the victim. An argument ensued

between the two men. This confrontation occurred twenty to forty feet from Lowe and Faucette.

While the defendant and victim exchanged words, the four witnesses observed, from different vantage points, that the defendant held his right hand behind his back. From where they were located, both Green and Brown observed that the defendant's hand, which was behind his back, was on the handle of a knife. Upon seeing the knife, Brown commented to Green, "He wouldn't dare do that."

After further words had been exchanged, the victim agreed to fight the defendant. The victim did not, however, make any physical movement toward the defendant. The defendant then pulled the knife from behind his back and began to make stabbing motions at the victim. One of these stabbing motions cut the victim's ice pop in half as the victim was retreating.

The victim ran into a nearby yard where he was pursued by the defendant. There, the defendant stabbed the victim in the upper left portion of his chest, causing his death. The defendant then reentered the car and left the scene. He was arrested in Miami, Florida, on August 17, 1990.

The defendant testified on his own behalf, relating a substantially different version of the incident. The defendant testified that, on the date of the homicide, he had been driving a car that his sister had rented. He and two passengers were driving on Homestead Avenue when the rental car was struck by an object. When the defendant got out to inspect the car, he confronted the victim who, he suspected, had thrown the object. Although the defendant did not recognize the victim initially, he soon recalled the jailhouse incident. The two men then began the argument that led to the stabbing. The defendant claimed that he had been "nervous and shaken" during this argument. He also

claimed that friends of the victim had approached the two of them. At this point, the defendant reached for a folding knife in his back pocket.

The defendant also testified that when the victim had swung the hand holding the ice pop, juice from the ice pop had blinded him. The defendant further claimed that, during the struggle that ensued, he had swung his knife only once and had not realized that he had struck anything until he had noticed blood on the knife and had seen the victim fall to the ground. He then left the scene and later the state, returned to Connecticut for a short period, and then left the state again, fearing that friends of the victim would kill him.

Other facts will be discussed as they pertain to particular issues in this case.

## I

The defendant first claims that the trial court violated his right to confront witnesses under the sixth and fourteenth amendments to the United States constitution by limiting his cross-examination of a state's witness.[3] Specifically, the defendant argues that the trial court improperly limited his cross-examination of that witness as to her status as a probationer. The state argues that the limitation was proper, and that if error, it was harmless beyond a reasonable doubt. Although we agree with the defendant that the limitation of the

---

[3] The sixth amendment to the United States constitution, as applied to the states through the fourteenth amendment in *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965), provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Although the defendant also relies on article first, § 8, of the Connecticut constitution, he has failed to differentiate his state constitutional claim from his federal constitutional claim. Thus, we consider only his sixth amendment claim under the federal constitution. *State* v. *Zarick*, 227 Conn 207, 226 n.18, 630 A.2d 565 (1993); *State* v. *Santiago*, 224 Conn. 325, 328 n.4, 618 A.2d 32 (1992).

cross-examination was improper, we also agree with the state that the error was harmless beyond a reasonable doubt.

The facts relevant to this claim are as follows. The witness in question, Jennifer Green, was one of four witnesses to testify to the defendant's murder of the victim. At the time she testified, Green was on probation for possession of marijuana, a misdemeanor. She had been placed on probation within one week before observing the defendant stab the victim and giving her statement to the police. During his cross-examination of Green, the defendant sought to question her as to her status as a probationer.[4] The state objected to this question on the ground of relevance. In response, the defendant argued that Green's probationary status would tend to show bias for the state. The trial court sustained the state's objection.

" 'The main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination. . . .' "* (Emphasis in original.) *Davis* v. *Alaska,* 415 U.S. 308, 315–16, 94 S. Ct. 1105, 39 L. Ed. 2d 374 (1974); *State* v. *Brigandi,* 186 Conn. 521, 533, 442 A.2d 927 (1982). Under the confrontation clause, the trial court should permit a defendant to expose to the jury "facts from which the jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Davis* v. *Alaska,* supra, 318; *State* v. *Santiago,* 224 Conn. 325, 331, 618 A.2d 32 (1992). An important function of cross-examination is exposure of a witness' motivation for testifying. *Greene* v. *McElroy,* 360 U.S. 474, 496, 79 S. Ct. 1400, 3 L. Ed. 2d 1377 (1959). Although the determination of the scope of

---

[4] Specifically, the following question was asked by the defendant: "Okay. All right. Now, Ms. Green, you are on probation for a criminal offense, are you not?"

cross-examination is within the discretion of the trial court; *State* v. *Moye,* 214 Conn. 89, 94, 570 A.2d 209 (1990); "[c]ross-examination to elicit facts tending to show . . . bias . . . is a matter of right and may not be unduly restricted." (Internal quotation marks omitted.) *State* v. *Santiago,* supra. "In determining whether a defendant's right of cross-examination has been unduly restricted, we consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Internal quotation marks omitted.) Id.

In this case, the trial court prohibited all inquiry into Green's potential bias arising out of her probationary status. Although the fact that a witness is on probation does not, invariably, require exposure to the jury; see *Delaware* v. *Van Arsdall,* 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986); we conclude, in this instance, that it was improper for the trial court to preclude all inquiry into Green's probationary status. The nearly contemporaneous occurrence of Green having been placed on probation and giving her statement to the police in connection with this case, taken in conjunction with the facts that Green continued to be on probation when she testified both at the defendant's probable cause hearing and at his trial, were circumstances that the defendant should have been allowed to explore for bias.

This conclusion, however, does not automatically require reversal of the judgment of the trial court. The trial court's improper preclusion of inquiry into Green's probationary status is subject to analysis as harmless error. *Delaware* v. *Van Arsdall,* supra, 684.[5] The

---

[5] The doctrine of harmless error is rooted in the fundamental purpose of our criminal justice system—to convict the guilty and acquit the inno-

defendant is not entitled to a new trial if a constitutional error was harmless beyond a reasonable doubt. *Chapman* v. *California,* 386 U.S. 18, 23–24, 87 S. Ct. 824, 17 L. Ed. 2d 705, reh. denied, 386 U.S. 987, 87 S. Ct. 1283, 18 L. Ed. 2d 241 (1967). To determine if constitutional error is harmless, "[t]he correct inquiry is whether, assuming that the damaging potential of the [precluded] cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Delaware* v. *Van Arsdall,* supra; *State* v. *Milner,* 206 Conn. 512, 529, 539 A.2d 80 (1988). Whether constitutional error is harmless in a particular case depends upon a number of factors, such as "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Delaware* v. *Van Arsdall,* supra; see *State* v. *Santiago,* supra, 333; *State* v. *Milner,* supra.

We conclude that the trial court's limitation of the defendant's cross-examination of Green was harmless beyond a reasonable doubt. Contrary to the defendant's contention, Green was not a key witness for the state.[6]

---

cent. "The harmless error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, *United States* v. *Nobles,* 422 U.S. 225, 230 [95 S. Ct. 2160, 45 L. Ed. 2d 141] (1975), and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error. *Rose* v. *Clark,* 478 U.S. 570, 577, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986) . . . *Delaware* v. *Van Arsdall,* 475 U.S. 673, 681, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)." (Internal quotation marks omitted.) *Bunkley* v. *Commissioner of Correction,* 222 Conn. 444, 460, 610 A.2d 598 (1992).

[6] In this regard, the defendant's reliance on *State* v. *Santiago,* 224 Conn. 325, 618 A.2d 32 (1992), is misplaced. In that case, we held that the trial court abused its discretion by preventing cross-examination of a former

Green was one of four witnesses who saw the incident in which the defendant killed the victim. The testimony of the four witnesses did not differ in any material way. The record indicates that witnesses other than Green saw the entire incident, including the stabbing of the victim by the defendant, and testified to that effect.[7] If Green had not testified, the trial record would have been substantially the same.

Moreover, although the court should have permitted the defendant to bring Green's probationary status to the jury's attention, her probation was not related to the homicide at issue, nor was it for an offense of a similar type, nor was Green a suspect in the case. Cf. *Davis* v. *Alaska,* supra, 310–12. Green did not know either the victim or the defendant. Additionally, the defendant was afforded other opportunities to challenge Green's credibility during cross-examination for bias.[8]

police officer as to his current relationship with the Hartford police. Two facts, taken together, required that holding in *Santiago.* They were: (1) the fact that the witness in question was the key witness for the state, because he was the only disinterested person who saw the altercation and implicated the defendant; and (2) the fact that the witness may have had a relationship with the prosecuting authorities in the criminal case. Id., 332. In the present case, neither fact is present. First, Green was not a key witness: she was one of four witnesses who observed the murder and gave testimony to that effect. Second, there is nothing in the record to suggest that Green had a current relationship with prosecuting authorities in a criminal case. Probation for an unrelated misdemeanor is not such a relationship. Accord *State* v. *Colton,* 227 Conn. 231, 630 A.2d 577 (1993).

[7] The principal defense raised by the defendant at trial was that he did not possess the requisite intent to kill the victim. Other witnesses gave testimony concerning the defendant's behavior toward the victim immediately prior to the stabbing that was relevant to the issue of intent. Victor Lowe testified to the defendant's confrontational approach to the victim. Lowe also testified to: (1) admissions by the defendant of his dispute with the victim; (2) the fact that the defendant had his hand behind his back when he approached the victim; (3) the defendant's pursuit of the victim; and (4) the defendant's plunging of a knife into the victim's chest.

[8] The record indicates that during cross-examination, Green testified that she found the victim attractive, held his hand as the victim was dying and felt sympathy for him.

We conclude that the preclusion of the defendant's cross-examination of Green as to her probationary status was harmless beyond a reasonable doubt.

## II

The defendant next claims that the evidence was insufficient to permit the jury to draw a reasonable inference that he possessed the intent to kill the victim.[9] This argument is without merit.

The standard governing our review of sufficiency of evidence claims is well established. "We first review the evidence presented at trial, construing it in the light most favorable to sustaining the facts expressly found by the trial court or impliedly found by the jury. We then decide whether, upon the facts thus established and the inferences reasonably drawn therefrom, the trial court or the jury could reasonably have concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Joyner,* 225 Conn. 450, 455, 625 A.2d 791 (1993). "[I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Grant,* 219 Conn. 596, 604, 594 A.2d 459 (1991).

---

[9] The defendant also argues that, at best, the evidence is consistent with a lesser degree of homicide. We note that the trial court instructed the jury on the lesser included offenses of manslaughter in the first degree; General Statutes § 53a-55a (1) and (3); manslaughter in the second degree; General Statutes § 53a-56 (a) (1); and criminally negligent homicide. General Statutes § 53a-58.

" 'In order to be convicted under our murder statute, the defendant must possess the specific "intent to cause the death" of the victim. General Statutes § 53a-54a. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim. General Statutes § 53a-3 (11).' " *State* v. *Montanez,* 219 Conn. 16, 20, 592 A.2d 149 (1991). "Ordinarily, intent can only be proved by circumstantial evidence; it may be and usually is inferred from the defendant's conduct. . . . Intent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death." (Citation omitted; internal quotation marks omitted.) Id. "Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct." Id. "The intent of the actor is a question for the trier of fact, and the conclusion drawn by the trier in this regard should stand unless it is an unreasonable one." *State* v. *Holley,* 174 Conn. 22, 26, 381 A.2d 539 (1977).

The state presented evidence at trial that four witnesses observed the initial confrontation in the street, saw the defendant with a knife in his hand and saw the defendant use that knife to make stabbing motions at the victim. Lowe, who described himself as being "very observant" of the events surrounding the stabbing, saw the victim retreat to a nearby yard and saw the defendant pursue the victim and stab him in the chest. Brown testified that she had not seen the actual stabbing, but had seen the defendant's hand "coming down with the knife," after which the victim began staggering. Faucette testified that he had seen the defendant make "four or five" motions with the knife, one of which cut the victim's ice pop in half. Faucette also saw the victim retreat and the defendant pursue him. Several of

the witnesses saw the defendant immediately leave the scene in the car in which he had arrived without rendering any assistance to the victim. This evidence was sufficient for the jury to infer that the defendant stabbed the victim with the intent to kill him.

The defendant's argument ultimately rests on the assertion of an "ice pop defense": blinded by the juice of the victim's ice pop, the defendant contends that he swung his knife randomly, and did not intend to stab the victim. The defendant contends that his version of what occurred precluded an inference that he specifically intended to cause the victim's death. We disagree. The jury could easily have rejected the defendant's version of the incident and could reasonably have inferred from the evidence presented at trial that the defendant possessed the requisite intent to kill the victim, and could have concluded that the state had proved this element beyond a reasonable doubt.

## III

The defendant next claims that the trial court improperly instructed the jury regarding the element of intent to kill. Specifically, the defendant contends that the instruction violated his constitutional right to due process by relieving the state of its burden to prove that the defendant intended to cause the victim's death. The defendant claims that the instruction improperly substituted causation for intent, thereby relieving the state of its burden of proof. Because the defendant failed to raise the claim at trial, he now seeks to prevail under *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[10] This claim merits little discussion. The lan-

---

[10] In connection with unpreserved constitutional claims, *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989), held that in order to prevail on appeal on a constitutional claim that has not been adequately preserved at trial, the defendant must meet all of the following conditions: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right;

guage the defendant challenges is almost identical to language that we recently determined did not warrant reversal in *State* v. *Boles,* 223 Conn. 535, 540–42, 613 A.2d 770 (1992). The defendant argues that the present case is factually distinguishable from *Boles.* We disagree.

If the trial court has given a preliminary instruction on the element of intent, the subsequent use of the language challenged here cannot be viewed in isolation.[11]

(3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." See also *State* v. *Stanley,* 223 Conn. 674, 688–89, 613 A.2d 788 (1992); *State* v. *Pinnock,* 220 Conn. 765, 778, 601 A.2d 521 (1992). "We have also held that we remain free to dispose of the claim by focusing on whichever condition is most relevant in the particular circumstances. . . ." (Internal quotation marks omitted.) *State* v. *Stanley,* supra, 688; *State* v. *Golding,* supra, 240.

[11] The challenged language in *Boles* was as follows: "Now, the second element is that the defendant, acting with that intent to cause the death of another person, caused the death of that person. This means that the defendant's conduct was the proximate cause of the victim's death. An act or omitted act is a proximate cause of death when it substantially and materially contributes that natural continuous sequence unbroken by any intervening cause to the resulting death. It is the cause without which the death would not have occurred and it's the predominating cause, the substantial factor, from which death followed as a natural, direct, and immediate consequence. *It's not necessary that the particular kind of harm that results from the defendant's act be intended by him or the death or injury caused by the defendant's conduct is a foreseeable and natural result of that conduct. The law considers the chain of legal causation unbroken and holds the defendant criminally responsible.*" (Emphasis added.) *State* v. *Boles,* 223 Conn. 535, 540–41, 613 A.2d 770 (1992).

The allegedly improper language in the instant case is as follows: "The second element—we're still under the murder charge—the second element is that the defendant acting with the intent to cause the death of another person, caused the death of that person, namely [the victim]. This means that the defendant's conduct was the proximate cause of [the victim's] death. And that is the proximate cause of death when it substantially and materially contributes in a natural and continuing sequence unbroken by an intervening cause, to the resulting death. It is the cause without which the death would not have occurred, and it is the predominating cause, the substantial factor from which death followed as a natural, direct, and immediate

The instruction neither eliminates the element of intent, nor substitutes causation therefor. Id., 542–43. We reject the defendant's claim that a difference in the theories of defense used in *Boles* and in this case distinguishes the latter significantly, and requires a different conclusion herein.[12] In both cases, the instruction required the state to prove the element of intent to satisfy its burden of proving the defendant guilty of murder. There was no constitutional error.[13]

Because this unpreserved claim does not meet the standard required under the second prong of *Golding*, the defendant may not prevail thereunder.

## IV

The defendant next claims that the trial court improperly instructed the jury that it could consider any false statements made by the defendant concerning the crime "as evidence tending to show a *guilty connection* by the accused with the crime charged."[14] (Empha-

---

consequence. *It is not necessary that the particular kind of harm that results from the defendant's acts be intended by him. Where the death or injury caused by the defendant's conduct is a foreseeable and natural result of that conduct, the law considers the chain of legal causation unbroken and holds the defendant criminally responsible."* (Emphasis added.)

[12] The defendant points out that in *State* v. *Boles*, 223 Conn. 535, 613 A.2d 770 (1992), the theory of the defense was that a third party culprit committed the crime, whereas here, the sole issue raised by the defendant was possession of the requisite intent.

[13] We are also unpersuaded by the defendant's claim that the challenged instruction created a mandatory presumption. It is clear from the record that the trial court instructed the jury that, although the intent to cause death may be inferred from circumstantial evidence, the jury was not required to draw such an inference from the defendant's conduct.

[14] The relevant part of the trial court's instruction regarding this issue is as follows: "If an accused should attempt to make false statements respecting himself and his conduct concerning the matter on trial, you may consider this as evidence tending to show a guilty connection by the accused with the crime charged.

"There is an area of our law that is called 'consciousness of guilt.' Whenever a person is on trial for a criminal offense, it is proper to show that

sis added.) Because this claim was not preserved at trial, the defendant seeks to prevail under *State* v. *Golding*, supra. The defendant argues that the challenged language allowed the jury to consider his false statements as evidence of guilt rather than as evidence of consciousness of guilt. This instruction, the defendant asserts, violated his federal and state constitutional rights by reducing the state's burden of proof and by burdening his right to testify.[15] We disagree.

Recently, we held that an unpreserved claim that the trial court improperly instructed the jury that "such [false] statements often tend to show a guilty connection by the accused with the crime charged" is not of constitutional magnitude, and thus does not meet the

person's conduct subsequent to the alleged criminal offense, which may fairly be inferred to have been influenced by the criminal act. The state of mind which is characterized as consciousness of guilt may be circumstantial evidence of guilt. If the defendant should attempt to thwart detection or apprehension by police, this might be shown, because such conduct might tend to show a guilty connection by the defendant with the crime charged. And flight is under this category. Flight, when unexplained, tends to prove consciousness of guilt. The flight of a person accused of crime is a circumstance which, when considered together with all the facts of this case, may justify a finding of the defendant's guilt. However, flight, if shown, is not conclusive. It is to be given the weight to which you, the jury, think it is entitled to, under the circumstances.

"Here, there was evidence that the defendant assumed that he was being sought for the charge, and fled from the area shortly after the alleged incident. There is also evidence tending to explain this flight, namely that the defendant fled because he feared retaliation. If you find that he was fleeing from this charge, you may consider it as evidence of his consciousness of guilt. If you find that he was not fleeing from this charge, you should not consider it evidence of his consciousness of guilt. It is up to you to give the evidence the weight to which it is entitled."

[15] The defendant claims a violation of his federal and state constitutional rights under the fifth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution, respectively. Although the defendant relies on article first, § 8, of the state constitution, he has failed to differentiate his state constitutional claim from his federal constitutional claim. Thus, we consider only his claim under the federal constitution. See footnote 3.

second prong of the test set forth in *Golding. State* v. *Adams,* 225 Conn. 270, 289–90, 623 A.2d 42 (1993). After reasserting the well established principle that jury instructions are to be considered as a whole rather than critically dissected, we stated "[i]n the present case . . . the language 'guilty connection' did not mandate that the jury find that the facts about which the defendant had made false statements were conclusively established. Rather, the instruction as a whole identified a permissive inference of consciousness of guilt that the jury might draw from the defendant's false statement, an item of circumstantial evidence." (Citations omitted.) Id., 289. In the present case, considering the charge in its entirety, we conclude that the trial court's use of the words "guilty connection" was not fatal to the otherwise thorough and proper jury instructions. See *State* v. *Murdick,* 23 Conn. App. 692, 702–703, 583 A.2d 1318, cert. denied, 217 Conn. 809, 585 A.2d 1233 (1991). Indeed, the trial court followed the challenged language with a proper instruction on the "consciousness of guilt," including an appropriate factual reference to the defendant's explanation of his flight after the crime. We fail to discern any reason to distinguish in this case our resolution of similarly challenged language in *State* v. *Adams,* supra.[16]

V

The defendant's final claim is that the trial court incorrectly instructed the jury as to its duty. He argues

[16] In *State* v. *Brown,* 199 Conn. 14, 505 A.2d 690 (1986), we implicitly questioned the propriety of the use of the phrase, "guilty connection," as a synonym for "consciousness of guilt." We concluded that the phrase, taken in the context of the entire charge, did not deprive the defendant of a fundamental constitutional right and a fair trial. Id., 27. Nonetheless, because of the possibility of the jury's confusing "guilty connection" as indicating evidence of guilt itself rather than evidence of consciousness of guilt; id.; it would be preferable for the trial court to omit the phrase "guilty connection" from its instructions regarding false statements made by the defendant. See *State* v. *Walton,* 227 Conn. 32, 63, 630 A.2d 990 (1993).

that the trial court violated his right to due process under the federal and state constitutions[17] by incorrectly instructing the jury on the presumption of innocence and the state's burden of proof, as follows:

"The accused justly relies upon you to consider carefully his claims, to consider carefully all of the evidence, and to find him not guilty if the facts and the law require such a verdict. He rightfully expects fair and just treatment from you.

"At the same time, the State of Connecticut and its people look to you as sworn officers of this Court to deal fairly, firmly, honestly and justly, as strong-minded men and women with the interest placed in your hands as an arm of the Court, to aid in upholding the law of the land, and to render a verdict of guilty if the facts and the law require such a verdict.

"It is the sworn duty of the courts and jurors to safeguard the rights of persons charged with crime by respecting the presumption of innocence which the law gives to every person so charged. But the law is made to protect society and innocent persons, and not to protect guilty ones."

The defendant failed to object to this language at trial, and thus seeks to prevail under *State* v. *Golding,* supra. The defendant's attack on this jury instruction is twofold. In the first instance, he argues that the language referring to the jury as an "arm of the court" as a part of the trial court's discussion on *conviction* alone presents an unbalanced, one-sided, prejudicial instruction. Our recent decision in *State* v. *Walton,* 227 Conn. 32, 62–66, 630 A.2d 990 (1993), is dispositive of this claim. In *Walton,* we held that the identical lan-

---

[17] The defendant has failed to differentiate his claim under article first, § 8, of the Connecticut constitution from his claim under the fourteenth amendment to the United States constitution. Thus, we consider only his claim under the federal constitution. See footnote 3.

guage: (1) did not raise an issue of constitutional dimension; and (2) even if it were considered to have raised such an issue, taking the instructions as a whole, there was no reasonable possibility that the jury was misled into believing that it would be performing its responsibilities only if it voted to convict. Id., 61–66. The same conclusions apply in this case.[18]

The defendant also challenges the following sentence from the jury instructions: "But the law is made to protect society and innocent persons, and not to protect guilty ones." The defendant argues that the challenged language undermined the presumption of innocence and diluted the state's burden of proof. The defendant argues that the language could suggest to some jurors that he was singled out as a person who was actually guilty. This claim invites us to revisit an issue that has been resolved repeatedly by this court.

Identical challenges were recently resolved against defendants in *State* v. *Walton,* supra, 66–67, *State* v. *Tucker,* 226 Conn. 618, 651–52, 629 A.2d 1067 (1993), and *State* v. *Stanley,* 223 Conn. 674, 695–96, 613 A.2d 788 (1992). Our recent line of cases regarding this claim is dispositive. " 'Those instructions, and any deviation from the previously approved language of those instructions did not, when viewed in the context of the entire charge, dilute the defendant's presumption of innocence or lessen the state's burden of proof . . . .' " *State* v. *Stanley,* supra, 696.

From a review of the record, we conclude that the court's charge, when taken in its entirety, was sufficient to inform the jury that the defendant was presumed innocent until the state proved otherwise and

[18] Nonetheless, we reiterate our suggestion in *State* v. *Walton,* 227 Conn. 32, 63, 630 A.2d 990 (1993), that it would be preferable for the trial court either to omit the challenged language itself or to balance it by reference to both instructions—acquittal as well as conviction.

that it was the state's burden to prove him guilty beyond a reasonable doubt. There was no constitutional error in connection with this instruction.[19] Accordingly, the defendant's claim fails under the third prong of the test set forth in *Golding*.

The judgment is affirmed.

In this opinion PETERS, C. J., CALLAHAN and BORDEN, Js., concurred.

BERDON, J., concurring. I agree with parts I, II and III of the majority opinion, and I agree that the claim pertaining to the instructions on consciousness of guilt in part IV was not preserved.

I also agree with the result in part V, but disagree specifically with footnote 19 and with the suggestion in footnote 18 that a "balanced" instruction may be given. See *State* v. *Stanley*, 223 Conn. 674, 702–703, 613 A.2d 788 (1992) (*Berdon, J.*, dissenting).

---

[19] The challenged language—"But the law is made to protect society and innocent persons, and not to protect guilty ones"—is immediately preceded by language emphasizing the presumption of innocence: "It is the sworn duty of the court and jurors to safeguard the rights of persons charged with crime by respecting the presumption of innocence." It is immediately followed by language emphasizing the jurors' duty when guilt has been proven beyond a reasonable doubt: "If and when the presumption of innocence has been overcome by evidence proving guilt beyond a reasonable doubt that an accused person is guilty of the crime charged . . . then it is the sworn duty of the jury to enforce the law, and to render a verdict of guilty." Under these circumstances, it is unlikely that a reasonable juror would have heard the challenged language as meaning anything more than the language that followed it, namely, that if the jurors were convinced of the defendant's guilt beyond a reasonable doubt, they are obligated to convict.

Nonetheless, because of the possibility that a juror might hear the language differently, and might be given to understand from it that only innocent persons should be acquitted, we suggest that either: (1) the challenged sentence be omitted; or (2) it be modified to provide as follows: "But the law is made to protect society and persons whose guilt has not been established beyond a reasonable doubt, and not to protect those whose guilt has been so established."