STATE OF CONNECTICUT *v.* OSCAR MELENDEZ
(AC 22785)

Foti, Bishop and Dupont, Js.

216

Argued October 16—officially released December 24, 2002

*Alice Osedach-Powers*, assistant public defender, for the appellant (defendant).

*Frederick W. Fawcett*, supervisory assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *John C. Smriga*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, Oscar Melendez, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a)[1] and an enhanced sentence pursuant to General Statutes § 53-202k.[2] On appeal, the defendant claims

---

[1] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . .

"(c) Murder is punishable as a class A felony . . . . "

[2] General Statutes § 53-202k provides in relevant part: "Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm . . . shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony."

that the trial court improperly (1) refused to instruct the jury on manslaughter as a lesser included offense, (2) charged the jury concerning the effects of impeachment evidence and the credibility of witnesses, (3) charged the jury concerning consciousness of guilt and (4) restricted his cross-examination of the state's key witness. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the afternoon of August 10, 1998, the victim, James Lindsay, and his girlfriend, Janette Rodriquez, were in the area of State Street and Iranistan Avenue in Bridgeport. The defendant and his father, Andres Melendez, who operated a nearby barbershop, approached in a van from which the two men exited. The men then approached the victim and began arguing with him, accusing him of having taken two dogs from the father's yard. Approximately two weeks earlier, in the same area, the victim and Rodriquez had found two pit bull puppies on a sidewalk next to a fence that ran to the backyard of the father's barbershop. Rodriquez and the victim had taken the dogs and had sold one of them.

The father went inside his barbershop while the defendant and the victim continued arguing outside. The father came back and told the defendant that he had spoken with his other son and that the problem was resolved. Despite that, the victim and the father resumed arguing. As they continued to argue, the defendant moved behind them. After five or ten minutes, the defendant, without warning, produced a gun and began firing at the victim, stating repeatedly: "Don't disrespect my father." The victim at first fell against a wall and then fell to the sidewalk as the shooting stopped. Rodriquez heard ten shots fired. The defendant ran to the van and fled. Rodriquez ran to a pay telephone on the street corner. Finding the telephone in use, she ran back and asked the defendant's father to call the police. Rodri-

quez later was taken to the police station where she identified a photograph of the defendant as being of the shooter.

Sergeant Mark Straubel of the Bridgeport police department came to the crime scene. Straubel found the victim lying on the sidewalk in great pain, short of breath and bleeding from the waist. Straubel asked the victim if he knew who shot him, and the victim replied that it had been "the son." Straubel observed empty shell casings on the victim's stomach and a spent bullet nearby.

The victim was transported to a hospital where he died the next day as a result of seven gunshot wounds, one each to the back of the left elbow, the third finger of the left hand and the lower left leg, and two each to the buttocks and the left lower abdomen. According to Ira Kanfer, a pathologist in the office of the chief medical examiner, the bullets injured the victim's pelvic organs, intestines and ileac artery, causing the victim to bleed to death. Two bullets were recovered from the victim's abdominal wall and turned over to the Bridgeport police.

Bridgeport Detective Joseph Adiletta, who processed the crime scene, found seven empty shell casings, two spent bullets and a copper jacket that was the outer shell of one of the bullets. Marshall Robinson, a firearms expert, determined that the casings found at the scene were all fired from the same semiautomatic pistol. According to Robinson, before the weapon could be fired, the shooter had to chamber the first bullet manually and then had to pull the trigger every time to fire a shot.

Officer Fernado Oquendo, who also came to the crime scene, unsuccessfully tried to locate the defendant after the shooting. Detective Richard Donaldson of the state violent crimes fugitive task force attempted

to execute an arrest warrant for the defendant on several occasions. It later was learned that the defendant had fled to Puerto Rico. The defendant subsequently returned and was arrested on November 23, 1999.

The defendant was charged with murder in violation of § 53a-54a (a) on December 6, 1999. The defendant waived a probable cause hearing and was tried before the jury. At trial, the defendant maintained that he was not the shooter and was not involved in the incident. He explained that when he saw on television that he was wanted in connection with the shooting, he became frightened and left the area. The jury found the defendant guilty of murder on December 6, 2000. He was sentenced on January 19, 2001, to the custody of the commissioner of correction for a term of thirty years, twenty-five years on the murder count plus an additional five years due to the enhancement of sentence under § 53-202k.

I

The defendant first claims that the court committed reversible error by refusing his request to charge the jury on manslaughter in the first degree in violation of General Statutes § 53a-55 (a) as a lesser offense included within the greater offense of murder. We disagree.

Our review of a court's refusal of a defendant's request to instruct the jury on a lesser included offense requires us to view the evidence in the light most favorable to granting the defendant's request. *State* v. *Montanez*, 219 Conn. 16, 22–23, 592 A.2d 149 (1991). We must reverse a court's failure to give such an instruction only if, as a matter of law, we cannot exclude the possibility that the defendant is guilty of only the lesser offense. *State* v. *Ray*, 228 Conn. 147, 155, 635 A.2d 777 (1993).

"A defendant does not have a fundamental constitutional right to a jury instruction on every lesser included offense . . . rather, the right to such an instruction is purely a matter of our common law. . . . Under [*State v. Whistnant,* 179 Conn. 576, 588, 427 A.2d 414 (1980)], [a] defendant is entitled to an instruction on a lesser offense if, and only if . . . (1) an appropriate instruction is requested by either the state or the defendant; (2) it is not possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser; (3) there is some evidence, introduced by either the state or the defendant, or by a combination of their proofs, which justifies conviction of the lesser offense; and (4) the proof on the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant innocent of the greater offense but guilty of the lesser." (Internal quotation marks omitted.) *State v. Solek,* 66 Conn. App. 72, 80–81, 783 A.2d 1123, cert. denied, 258 Conn. 941, 786 A.2d 428 (2001).

The parties agree that the defendant has satisfied the first two requirements of the four-pronged *Whistnant* test. The defendant, however, also must satisfy prongs three and four. "For the third and fourth requirements of *Whistnant* to be satisfied, there must be *sufficient* evidence, introduced by either the state or the defendant, or by a combination of their proofs, to justify a finding of guilt of the lesser offense." (Emphasis in original; internal quotation marks omitted.) Id., 83.

The essential element that differentiates the crime of murder from intentional or reckless manslaughter is the mental state or intent of the defendant. "The offense of murder requires that the defendant intentionally cause the death of another; General Statutes § 53a-54a (a); while the offense of manslaughter in the first degree provides that a person is guilty when, with intent to

cause serious physical injury to another person, he causes the death of such person; General Statutes § 53a-55 (a) (1); or under circumstances evincing extreme indifference to human life, he recklessly engages in conduct that creates a grave risk of death and causes the death of another. General Statutes § 53a-55 (a) (3)." *State* v. *Solek*, supra, 66 Conn. App. 83–84. A person also is guilty of manslaughter in the first degree if that person committed murder under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse.[3] General Statutes §§ 53a-54a (a) and 53a-55 (a).

The defendant claims that the court should have given the jury an instruction on manslaughter because the element of intent was sufficiently in dispute for the jury to have reasonably found that he was not guilty of murder, but guilty of the lesser offense because either he intended only serious injury, was acting recklessly in disregard of the risk of death or was experiencing an extreme emotional disturbance. We are not persuaded.

A

Regarding a charge of intentional manslaughter, the defendant argues that the shooting of the victim was a spontaneous reaction to the argument between the victim and the defendant's father, and showed intent to harm but not to kill. The defendant explains that, considering Rodriquez' testimony that in firing the gun the defendant kept "waving it down," along with evidence of the direction and location of the gunshot wounds, the jury reasonably could have believed that the defendant's intent was to direct the shots away from vital areas of the victim's body, because, due to the proximity of the defendant to the victim, he was close enough to have

---

[3] The reasonableness of such a claim "is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be . . . ." General Statutes § 53a-54a (a).

done otherwise. Finally, the defendant contends that because the victim did not fall immediately to the ground and was still alive when the defendant fled the scene, a jury could find that the defendant did not intend to kill the victim.

"We consistently have concluded that the specific intent to kill may be proven solely by circumstantial evidence, as long as that evidence establishes beyond a reasonable doubt that the defendant had the conscious objective to take the life of another. . . . The defendant's intent to kill, therefore, may be inferred from evidence of the defendant's use of a deadly weapon, the manner in which the weapon was used, and the nature and number of wounds inflicted. . . . It is axiomatic that a factfinder may infer an intent to kill from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death." (Citation omitted; internal quotation marks omitted.) *State* v. *Solek*, supra, 66 Conn. App. 84–85.

In the present case, the concealed pistol used by the defendant was a deadly weapon; General Statutes § 53a-3 (6);[4] and he fired at the victim from behind, without any warning and in close proximity, at least seven, possibly as many as ten, times. Although the victim's head and chest were not struck, the seven bullet wounds that the defendant inflicted caused sufficient injury to the victim's pelvic organs, intestines and ileac artery to cause the victim to bleed to death. Given that most, if not all, of the shots fired actually hit the victim, including multiple wounds in the abdomen and buttocks, the notion that the defendant was aiming down

---

[4] General Statutes § 53a-3 (6) provides in relevant part: " 'Deadly weapon' means any weapon, whether loaded or unloaded, from which a shot may be discharged . . . ." "A pistol, dirk-knife, or gun is a deadly weapon per se." *State* v. *Litman*, 106 Conn. 345, 352, 138 A. 132 (1927).

at the ground or only at nonvital areas is unreasonable. The defendant fled the area immediately after the shooting and did not summon any medical assistance. Both are indicia of an intent to kill. *State* v. *Sivri*, 231 Conn. 115, 129–30, 646 A.2d 169 (1994).[5] Even after considering all the evidence in the light most favorable to the defendant, we conclude that there is insufficient evidence from which a jury could reasonably and logically have inferred that he intended only to harm, but not to kill, the victim.

## B

The defendant repeats the same arguments discussed in part I A as evidence that the jury could find that he did not intend to kill the victim, but was acting only in a reckless manner with extreme indifference to human life. In support of his claim, the defendant relies on three cases in which the defendants were found guilty of reckless manslaughter. The defendant's actions in the present case, however, cannot reasonably be characterized as merely reckless. The defendant shot a gun at the victim between seven and ten times in close proximity, wounding him at least twice in the abdomen. His actions therefore were far more egregious and thus

---

[5] "In both *State* v. *Greenfield*, [228 Conn. 62, 78, 634 A.2d 879 (1993)], and *State* v. *Francis*, 228 Conn. 118, 128–29, 635 A.2d 762 (1993), we noted the defendant's failure to summon medical assistance for his victim as part of the evidence from which the jury could have inferred an intent to kill. The reasoning underlying those cases is that it can be inferred that, if the defendant has caused a grievous wound that could cause the victim's death if not treated promptly, the failure to summon that treatment is consistent with an antecedent intent to cause death." *State* v. *Sivri*, supra, 231 Conn. 129. Additionally, the defendant's fleeing the scene and subsequent flight to Puerto Rico are evidence of his consciousness of guilt. "We have in the past considered consciousness of guilt evidence as part of the evidence from which a jury may draw an inference of an intent to kill. See *State* v. *Patterson*, 229 Conn. 328, [333–34], 641 A.2d 123 (1994); *State* v. *Francis*, supra, 228 Conn. 131; *State* v. *Reid*, 193 Conn. 646, [655–56], 480 A.2d 463 (1984)." *State* v. *Sivri*, supra, 130.

distinguishable from those of the defendants in the cases referred to in his principal brief.

In *State* v. *Pitt*, 28 Conn. App. 825, 828, 612 A.2d 60, cert. denied, 224 Conn. 907, 615 A.2d 1049 (1992), there was evidence that the defendant intended to shoot near the victim's feet to stop the victim from approaching him, but the defendant lost his balance and a shot went astray, killing the victim. In this case, however, the defendant deliberately had moved behind the victim before firing. The victim was not advancing toward the defendant. The defendant did not lose his balance or otherwise mistakenly make a fatal shot, as occurred in *Pitt*. Further, the defendant shot at the victim in a waving motion hitting the victim seven times, not once.[6]

In *State* v. *Hallowell*, 61 Conn. App. 463, 468, 766 A.2d 950 (2001), the defendant, from a distance of forty to sixty feet, twice fired a shotgun at several individuals who had been chasing him in an automobile. In doing so, the defendant killed a passenger in the automobile. Id. In the present case, the defendant shot the victim at close range, not from forty feet away, and the defendant was not shooting at something else, such as a car, but specifically fired at the victim.

In *State* v. *Best*, 56 Conn. App. 742, 749, 745 A.2d 223, cert. denied, 253 Conn. 902, 753 A.2d 937 (2000), the defendant mother struck her twenty month old child several times in the abdominal area, causing death. In

---

[6] In *Pitt*, the defendant and the victim were arguing outside the defendant's apartment. "The defendant turned to walk back into the apartment building and the victim ran toward the defendant. The defendant then turned and fired two shots at the ground near the victim's feet. The victim stopped. The defendant again turned to walk into the apartment and the victim again ran toward the defendant. The defendant turned and again fired two shots at the ground near the victim's feet. The victim stopped. The defendant turned for a third time to enter the apartment. The victim again approached the defendant. This time, however, the defendant lost his balance when he turned toward the victim, and the gun went off, fatally wounding the victim." *State* v. *Pitt*, supra, 28 Conn. App. 828.

a case of child abuse, death reasonably might be an unintended consequence of reckless behavior; in the present case, the defendant inflicted the fatal abdominal wounds not with his hands, but with multiple shots from a deadly weapon.

Further, the state presented evidence through its expert, Robinson, that the defendant had to chamber the first round before he could fire the weapon and that he had to pull the trigger each time he fired. This is not a case in which the gun kept firing accidentally. The jury reasonably could have inferred intent to kill, but not mere recklessness, from the defendant's actions. As with intentional manslaughter, there was insufficient evidence to require the court to instruct the jury on the lesser included offense of reckless manslaughter.

C

Finally, the defendant claims that the court should have instructed the jury on the defense of extreme emotional disturbance. See General Statutes §§ 53a-54a (a) and 53a-55 (a) (2). The defendant argues that he was upset by the argument over the dogs and that his repeating of "[d]on't disrespect my father" while shooting showed his agitated state.

"Extreme emotional disturbance . . . is . . . an affirmative defense upon which the burden of persuasion rests on the defendant." *State* v. *Small*, 242 Conn. 93, 117, 700 A.2d 617 (1997) (*Borden, J.*, concurring). "To sustain his burden of establishing extreme emotional disturbance by a preponderance of the evidence, the defendant must persuade the trier of fact that: (1) the emotional disturbance is not a mental disease or defect that rises to the level of insanity as defined by the penal code; (2) the defendant was exposed to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness; and (3) the defendant

had an extreme emotional reaction to it, as a result of which there was a loss of self-control, and reason was overborne by extreme intense feeling, such as passion, anger, distress, grief, excessive agitation or other similar emotions." (Internal quotation marks omitted.) *State* v. *DeJesus*, 236 Conn. 189, 202–203, 672 A.2d 488 (1996).

On the basis of our review of the record and transcript, we conclude that the defendant has failed to sustain his burden of production. The defendant's counsel admitted to the court that he had failed to put on evidence in that regard. Because there was insufficient evidence regarding the defendant's emotional state, the court properly did not instruct the jury on manslaughter founded on an extreme emotional reaction defense.

We conclude, therefore, that because the defendant's state of mind was not sufficiently in dispute, the court did not improperly fail to instruct the jury on lesser included offenses because the jury could not reasonably have found the defendant innocent of murder, but guilty of manslaughter in the first degree under any of the proffered theories.

II

The defendant's second claim is that the court's instruction to the jury regarding the effects of impeachment evidence and the credibility of witnesses was inadequate, inaccurate and did not, in substance, conform to his requested instruction.

"Our standard of review concerning claims of instructional error is well settled. [J]ury instructions must be read as a whole and . . . are not to be judged in artificial isolation from the overall charge. . . . The whole charge must be considered from the standpoint of its effect on the jurors in guiding them to a proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . The instruction must be

adapted to the issues and may not mislead the jury but should reasonably guide it in reaching a verdict. . . . We must review the charge as a whole to determine whether it was correct in law and sufficiently guided the jury on the issues presented at trial. . . . [T]he trial court must correctly adapt the law to the case in question and must provide the jury with sufficient guidance in reaching a correct verdict." (Internal quotation marks omitted.) *State* v. *Solek*, supra, 66 Conn. App. 87–88.

In the present case, defense counsel requested a supplemental credibility charge concerning Rodriquez' convictions for larceny and forgery, and her use of aliases. The defendant believed it was paramount to his defense that the instruction to the jury specifically address Rodriquez' credibility, as her testimony was the only eyewitness account of the shooting. Although any relevant and accurate request to charge must be given, "a refusal to charge in the exact words of a request will not constitute error if the requested charge is given in substance." *Mazzucco* v. *Krall Coal & Oil Co.*, 172 Conn. 355, 357, 374 A.2d 1047 (1977). The court gave a charge on credibility and impeachment that provided the same substantive instruction without emphasizing credibility as to Rodriguez. Although the defendant would have us believe the general instruction was inadequate to guide the jury properly in applying the law, for the following reasons, we are not persuaded.

Only two witnesses testified that they had been convicted of felonies, Rodriquez and the defendant's brother, who testified that the defendant had not been present at the crime scene. The trial lasted only a few days, so it is improbable that the jury would have been confused or misled as to whom the court's instruction regarding past convictions referred. The court, in addition to giving its general instruction, specifically instructed the jury that testimony of identification

should be "thoroughly scrutinized" and that the reliability of each such witness was "of paramount importance." Although Rodriquez was not mentioned by name, the jury, which heard testimony about not only Rodriquez' past crimes but about her drug use, in all likelihood could not have been misled as to whom those instructions pertained or of the importance of careful scrutiny.

Further, despite the defendant's contention that Rodriquez was the state's "star witness" and the only witness to identify him, thereby justifying a more specific jury instruction, there was other evidence, namely, the victim's dying declaration that the defendant had shot him, from which the jury could have found the defendant guilty even after fully discounting Rodriquez' testimony. Even though the victim's declaration rendered harmless any error regarding the court's instruction, we nonetheless conclude that under the circumstances presented and, when the charge is read as a whole, the instruction given was sufficient to guide the jury and, therefore, was not improper.

### III

The defendant's third claim is that the court improperly instructed the jury that his flight to Puerto Rico was evidence of consciousness of guilt and that the instruction, as given, was misleading and inadequate. Our standard of review of jury instructions is set out in part II. We reiterate that we will not dissect an instruction or read portions out of context; "jury instructions need not be exhaustive, perfect, or technically accurate." (Internal quotation marks omitted.) *State* v. *Solek*, supra, 66 Conn. App. 88.

The defendant argues for the first time on appeal that the court's instruction that "flight, when explained, tends to prove circumstances of guilt," was improper and misleading. If defense counsel believed that the

court had misspoke and that this somehow was misleading, he should have brought it to the attention of the judge. Our review of the transcript shows that although defense counsel objected to giving the jury an instruction on consciousness of guilt, he did not object at any time to the wording of the instruction as given and therefore failed to preserve that issue for review. See *State* v. *Pinnock*, 220 Conn. 765, 796, 601 A.2d 521 (1992) (review of defendant's challenge to jury instruction declined because defendant failed to apprise trial court of specific objection).

We note, however, that our Supreme Court has upheld the validity of an instruction on flight as evincing consciousness of guilt despite attacks on its appropriateness; see *State* v. *Hines*, 243 Conn. 796, 815–16, 709 A.2d 522 (1998); and "[t]he decision whether to give an instruction on flight, as well as the content of such an instruction, if given, should be left to the sound discretion of the trial court." Id., 816. We cannot say that the court here abused its discretion in giving this particular charge. When read as a whole, the overall charge was correct in the law and provided the jury with a sufficient guide to apply the facts of this case to the law properly. We conclude, therefore, that the court did not improperly instruct the jury on flight as consciousness of guilt.

IV

Finally, the defendant claims that the court improperly and unduly restricted the cross-examination of Rodriguez about her drug use and its affect on her ability to recall, thereby violating his rights to confrontation and to put on a defense as guaranteed by the sixth amendment, which is applicable to state prosecutions by incorporation through the fourteenth amendment. We disagree.

"Although it is within the trial court's discretion to determine the extent of [impeachment] and the admissibility of evidence, the preclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitutional requirements of the [confrontation clause] of the sixth amendment. . . . Whether limitations on impeachment, including cross-examination, are so severe as to violate the confrontation clause of the sixth amendment is a question of law reviewed de novo." (Citation omitted; internal quotation marks omitted.) *State* v. *Abernathy*, 72 Conn. App. 831, 836–37, 806 A.2d 1139, cert. denied, 262 Conn. 924, 814 A.2d 379 (2002).

We note that the United States Supreme Court has stated that the sixth amendment's confrontation clause does not prevent a trial judge "from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination . . . . [T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis in original; internal quotation marks omitted.) *Delaware* v. *Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).

"The [sixth amendment to the] federal constitution [also] require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The defendant's sixth amendment right, however, does not require the trial court to forgo completely restraints on the admissibility of evidence. . . . Generally, an accused must comply with established rules of procedure and evidence in exercising his right

to present a defense." (Citations omitted; internal quotation marks omitted.) *State* v. *Cerreta*, 260 Conn. 251, 260–61, 796 A.2d 1176 (2002).

Rodriquez testified on direct examination that at the time of the shooting, she used drugs regularly but that the fact that she had used drugs on that day had not prevented her from recalling what she had seen. On cross-examination, the defendant further elicited from Rodriquez that she was addicted to heroin and that approximately one and one-half hours prior to the shooting, she had injected heroin and smoked crack cocaine. Defense counsel then asked whether the victim had been present, to which the state objected on the ground of relevancy.

During the ensuing dialogue between counsel and the court about the relevance of the victim's drug use, defense counsel suggested that he planned to inquire into whether ingestion of narcotic substances affected the ability of the witness to observe, recall and report what she had seen. The court informed defense counsel that he had to provide *some* foundation, such as competent medical authority, that such an effect existed before such questioning would be allowed. Defense counsel then stated that he would try to lay such a foundation by asking Rodriquez specifically about her drug use. The court agreed to allow that.

Defense counsel then asked: "Based upon your use back then, how often would you need to consume the heroin before you began going through any sort of physical withdrawal?" The state objected without stating a reason, and the court sustained the objection without comment. Defense counsel made no attempt to rephrase the question or to otherwise continue with that questioning, but immediately moved on to other

questions. The defendant is therefore inaccurate when he states in his principal brief that "the court prohibited any further inquiry." Counsel in fact abandoned the inquiry.

Again, before recross-examination, defense counsel was instructed by the court that he could ask Rodriquez whether she had experienced withdrawal symptoms or other effects of drug use that would affect her ability to perceive or to recall events. Defense counsel then questioned the witness on the effect known as "nodding out" in which heroin users lose consciousness for various periods of time. The court did not prevent defense counsel from further pursuing that line of questioning; in fact, the court asked several clarifying questions of Rodriquez about "nodding." Rodriquez testified that beginning addicts might "nod" all day, but that she, as an addict of twenty years, could control the effect. The court asked both the state and the defense to ask any further questions they had, and that invitation was not accepted.

On the basis of our review of the transcript, we conclude that the court did not improperly prevent defense counsel from exploring the degree to which Rodriquez' drug use affected her mental capabilities; the court simply required the defense to lay a proper foundation under our established rules of procedure and evidence. The defendant, therefore, had a full opportunity to effectively cross-examine all witnesses and to put on a defense as permitted under the sixth amendment.

The judgment is affirmed.

In this opinion the other judges concurred.