STATE OF CONNECTICUT *v.* ABDUL MUKHTAAR
(SC 15801)

McDonald, C. J., and Borden, Palmer, Sullivan and Callahan, Js.

Argued September 22, 1999—officially released May 17, 2000*

*Suzanne Zitser*, assistant public defender, with whom, on the brief, was *Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Susann E. Gill*, senior assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *John C. Smriga*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. After a jury trial, the defendant, Abdul Mukhtaar, was convicted of murder in violation of General Statutes § 53a-54a.[1] The trial court rendered judg-

---

* May 17, 2000, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

ment[2] in accordance with the jury verdict, and the defendant appealed.[3] On appeal, the defendant maintains that the trial court improperly: (1) rejected his claim that the state, during jury selection, had exercised its peremptory challenges in a racially discriminatory manner; (2) failed to make an adequate inquiry into allegations of juror bias; (3) permitted the state to introduce a witness' prior inconsistent written statement as substantive evidence; and (4) instructed the jury on the presumption of innocence and reasonable doubt. We reject the defendant's claims and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. At approximately 4 p.m. on February 14, 1996, Benjamin Sierra, Jr., was driving his parents' car on Fairfield Avenue in Bridgeport. While stopped at a red light at the intersection of Fairfield and Iranistan Avenues, Sierra spotted two young women, Tracey Gabree and Terri Horeglad, with whom he was acquainted, standing at a nearby pay telephone. Sierra waved to Gabree and Horeglad and they approached and entered Sierra's car. Horeglad sat in the front passenger seat and Gabree sat in the back seat.

Gabree asked Sierra for a cigarette. Sierra then turned around and gave her a cigarette and a light. Sierra asked Gabree and Horeglad where they were going and one of them responded that they were homeless and just wanted to get warm.

When Sierra turned back toward the front of the car, he observed that his vehicle was blocked by a tan car that was facing the wrong direction on Fairfield Avenue.

---

[2] The trial court sentenced the defendant to a total effective prison term of fifty years.

[3] The defendant appealed from the judgment of the trial court to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and what is now Practice Book § 65-1.

At that moment, Gabree shouted: "Oh shit, Kareem!" Gabree then fled from Sierra's car. A man, later identified by Sierra and Gabree as the defendant, emerged from the tan car and approached the passenger side of Sierra's car, where Horeglad remained seated. Sierra jumped out of his car and asked the defendant what was wrong. The defendant, who did not respond, pulled out what appeared to be a .32 or .38 caliber chrome plated revolver and fired four shots at Horeglad, each of which entered the right side of her body. Horeglad died as a result of the gunshot wounds. Additional facts will be set forth as necessary.

I

The defendant first claims that he is entitled to a new trial because the state improperly exercised its peremptory challenges in a racially discriminatory manner. We disagree.

Before addressing the defendant's contentions, we first summarize the applicable law. "In *Batson* [v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)] the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race . . . . *State* v. *Robinson*, [237 Conn. 238, 243–44, 676 A.2d 384 (1996)]. . . .

"Under Connecticut law, [o]nce a [party] asserts a *Batson* claim, the [opposing party] must advance a neu-

tral explanation for the venireperson's removal. . . . The [party asserting the *Batson* claim] is then afforded the opportunity to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual.[4] . . . [T]he trial court then [has] the duty to determine if the [party asserting the *Batson* claim] has established purposeful discrimination. . . . The [party asserting the *Batson* claim] carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination. . . .[5]

"We have identified several specific factors that may indicate that [a party's removal] of a venireperson through a peremptory challenge was . . . motivated [by race or gender]. These include, but are not limited to: (1) [t]he reasons given for the challenge were not

---

[4] "Under federal law, a three step procedure is followed when a *Batson* violation is claimed: (1) the party objecting to the exercise of the peremptory challenge must establish a prima facie case of discrimination; (2) the party exercising the challenge then must offer a neutral explanation for its use; and (3) the party opposing the peremptory challenge must prove that the challenge was the product of purposeful discrimination. See, e.g., *Hernandez* v. *New York*, 500 U.S. 352, 358–59, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991); *Batson* v. *Kentucky*, supra, 476 U.S. 96–98. Pursuant to this court's supervisory authority over the administration of justice, we have eliminated the requirement, contained in the first step of this process, that the party objecting to the exercise of the peremptory challenge establish a prima facie case of discrimination. *State* v. *Holloway*, 209 Conn. 636, 646 & n.4, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989). Thus, in this state, after the party contesting the use of the peremptory challenge has raised a *Batson* claim, the party exercising the challenge must proffer a race neutral explanation for its decision to strike the venireperson from the jury array. Id., 646. In Connecticut, therefore, the party objecting to the exercise of the peremptory challenge satisfies step one of the tripartite process simply by raising the objection." *State* v. *Hodge*, 248 Conn. 207, 219 n.18, 726 A.2d 531 (1999).

[5] Thus, "our state jurisprudence differs from *Batson* only in that, under state law, we dispense with the requirement that the [party opposing the peremptory challenge] make a prima facie showing of discrimination." *State* v. *Hodge*, 248 Conn. 207, 220–21 n.19, 726 A.2d 531 (1999).

related to the trial of the case . . . (2) the [party exercising the peremptory strike] failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race [or gender] were asked a question to elicit a particular response that was not asked of the other jurors . . . (4) persons with the same or similar characteristics but not the same race [or gender] as the challenged juror were not struck . . . (5) the [party exercising the peremptory strike] advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . and (6) the [party exercising the peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race [or gender]. . . .

"In assessing the reasons proffered in support of the use of a peremptory challenge . . . [a]n explanation . . . need not . . . be pigeon-holed as wholly acceptable or wholly unacceptable . . . and even where the acceptability of a particular explanation is doubtful, the inquiry is not at an end. In deciding the ultimate issue of discriminatory intent, the judicial officer is entitled to assess each explanation in light of all the other evidence relevant to prosecutorial intent. The officer may think a dubious explanation undermines the bona fides of other explanations or may think that the sound explanations dispel the doubt raised by a questionable one. As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances. . . .

"Finally, the trial court's decision on the question of discriminatory intent represents a finding of fact that will necessarily turn on the court's evaluation of the demeanor and credibility of the attorney of the party exercising the peremptory challenge. . . . Accordingly, a trial court's determination that there has or has not been intentional discrimination is afforded great

deference and will not be disturbed unless it is clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citations omitted; internal quotation marks omitted.) *State* v. *Hodge*, 248 Conn. 207, 218–24, 726 A.2d 531 (1999); accord *State* v. *King*, 249 Conn. 645, 657–60, 735 A.2d 267 (1999). Guided by these principles, we now turn to the defendant's claim.

The defendant contends that the trial court improperly denied his *Batson* challenge to the state's use of a peremptory challenge to strike venireperson J.J.,[6] an African-American female. The defendant argues that the state's challenge of J.J. was pretextual because the proffered explanation for striking her was not supported by her responses and, also, because the state later accepted a white venireperson, J.O., who, according to the defendant, gave answers comparable to those of J.J.

The following additional facts are necessary to our resolution of this claim. During her voir dire examination, J.J. indicated to defense counsel that she might be uncomfortable serving on the jury.[7] Thereafter, the

[6] We use the initials of each venireperson to protect that venireperson's legitimate privacy interests.

[7] The relevant portion of the voir dire is as follows:

"[Gerald Bodell, Defense Counsel]: And this is a case . . . which involves an act of violence. Is that type of case one . . . which would cause you to feel that—or would prevent you from wanting to serve as a juror?

"[J.J.]: I wouldn't feel very comfortable doing it.

"[Mr. Bodell]: What about that makes you feel uncomfortable?

"[J.J.]: I sometimes, when you, you know, I haven't heard this case. I don't know anything about it, but sometimes, when you read things in the paper about different—every situation, you kind of force your own opinion, but, you know, I say I think I would feel very uncomfortable doing it.

\* \* \*

assistant state's attorney (state's attorney), during his questioning of J.J., sought to clarify why J.J. had indicated some discomfort with serving as a juror in this case. J.J. responded that she was uncertain whether she "really could be fair in [her] judgment." Upon further questioning, J.J. explained that making decisions affecting another person's life would be different from making decisions concerning her own.[8] J.J. also agreed that she would not have a problem acquitting the defendant if the state did not prove its case. When the state's attorney asked J.J. if she would have any difficulty convicting the defendant if she found that the state had proved its case, she responded: "I may have some hesitation. I mean, I can't say yes or no until I hear everything, all the evidence or whatever it is." When asked if her hesitation would affect her ability to be objective in a criminal case, she answered: "I think there's always some hesitation."

At the conclusion of J.J.'s voir dire, the state's attorney moved to excuse her for cause, citing concerns

"[Mr. Bodell]: When you say you feel uncomfortable, is that a way in which you feel that you could not so much as make a decision in the case, would feel uncomfortable making a decision?

"[J.J.]: I guess I would.

"[Mr. Bodell]: You would be able to?

"[J.J.]: Yeah."

[8] The relevant portion of the voir dire is as follows:

"[John Smriga, Assistant State's Attorney]: Are you the kind of person that generally feels comfortable making major decisions or do you feel even in your own life you're the sort of person that would rather not make those major decisions?

"[J.J.]: Well, in my own life, I could make my own decisions . . . [b]ecause I feel like the only consequences I have to deal with is me . . . [b]ut in this kind of thing, you're dealing with a person's life . . . . So, that's a whole different situation.

"[Mr. Smriga]: And, that's what elevates it to a higher thing for you?

"[J.J.]: That's right."

about whether she could be objective.[9] The trial court denied that motion. The state then sought to exercise a peremptory challenge against J.J. The defendant objected on the ground that the challenge was racially motivated. The state's attorney advanced the same explanation that he had made in support of his challenge for cause, adding that "if a person comes in here and they express at the very minimum . . . hesitation in perhaps being able to find someone guilty, I would certainly be irresponsible if I did not excuse that person whether they were black, white or any other race." The trial court concluded that J.J.'s responses regarding her potential difficulty in voting to convict constituted a valid, race neutral reason for the exercise of a peremptory challenge.[10] Consequently, the court accepted the state's peremptory challenge and J.J. was excused.

We agree with the state that the record supports the trial court's finding that the reason proffered by the state's attorney for excluding J.J. was not pretextual. J.J.'s responses provided a legitimate, nondiscriminatory basis for the state's attorney's apprehension that J.J. might have difficulty voting to convict the defendant, even if the evidence established the defendant's guilt beyond a reasonable doubt. J.J. expressed hesi-

---

[9] In support of his challenge for cause, the state's attorney argued: "The issue of primary importance is whether or not [J.J.] could be objective and render an objective decision. She clearly indicated that the issue of finding someone guilty was difficult for her. And I think that, minimally, a juror should be able to . . . indicate that, if they have hesitation, which many jurors say that they do, that, at least if the case was proved, they could follow the instructions of the court. And I don't believe that [J.J.] was able to do that."

[10] Specifically, the trial court stated: "The court agrees and feels the [state's attorney] has provided a sufficient reason not based on race. There [were] several times [that J.J.] talked about hesitation, both in the defense [counsel's] questions and the state's [attorney's]. Hesitation is obviously a factor that the defense often generally likes. Hesitation is something that the state does not particularly care for. I think it's a legitimate basis. Several of [J.J.'s] answers provide a basis for the state to exercise a peremptory challenge."

tancy as to whether she could find a person guilty of a serious crime, but expressed no such reluctance when asked about her willingness to find someone not guilty of such a crime. We previously have stated that a venireperson's "indecisive or equivocal commitment to the prevailing standard of proof beyond a reasonable doubt . . . if adequately substantiated, satisfies *Batson* because a prosecutor has a legitimate interest in obtaining jurors who will faithfully adhere to the governing burden of proof." *State* v. *Gonzalez*, 206 Conn. 391, 404–405, 538 A.2d 210 (1988). Because J.J.'s responses suggested that she might have difficulty in objectively determining guilt, we agree with the state that the proffered explanation for her exclusion was supported by the record and, consequently, that the trial court's rejection of the defendant's *Batson* claim was not improper.

In support of his claim of pretext, the defendant also contends that the state did not seek to strike J.O., a white female, even though, according to the defendant, J.O.'s responses were similar to those of J.J. See, e.g., *State* v. *Hinton*, 227 Conn. 301, 325, 630 A.2d 593 (1993) (pretext may be shown when "persons with the same or similar characteristics but not the same race as the challenged juror were not struck" [internal quotation marks omitted]). The defendant raises this claim, however, for the first time on appeal. As we recently have stated in refusing to review such an unpreserved claim, "[i]t would be both unfair and unreasonable to require the trial court to conduct a comparative evaluation of the backgrounds of venirepersons who have not been identified by the defendant in support of his *Batson* claim. Because a party is entitled to raise a *Batson* challenge at any time prior to the swearing in of the jury; *State* v. *Robinson*, supra, 237 Conn. 250; there is no reason why the burden of identifying, with reasonable specificity, those venirepersons whose selection by the

opposing party tends to support the moving party's *Batson* claim should be on the trial court, rather than on the party making the *Batson* claim. Moreover, because a claim of purposeful discrimination under *Batson* raises issues of fact to be decided by the trial court, the moving party's failure to inform the trial court of the full factual basis for the claim renders that claim unreviewable." *State* v. *Hodge*, supra, 248 Conn. 228 n.24. Accordingly, the defendant's disparate treatment claim, raised for the first time on appeal, is not reviewable.

The defendant nevertheless claims that this case constitutes an exception to the general rule of unreviewability. In particular, the defendant contends that, in the exercise of our supervisory authority over the administration of justice,[11] we should require the trial court, on its own motion, to reexamine its rejection of any previous *Batson* challenge when the court thereafter finds that a prosecutor's explanation for seeking to strike a subsequent venireperson is pretextual. The defendant asserts that this proposed exception is applicable to this case because, the defendant alleges, the trial court, in rejecting the state's exercise of a peremptory challenge against a subsequent venireperson, M.B., an African-American female, found that the explanation

---

[11] "Appellate courts possess an inherent supervisory authority over the administration of justice. . . . The standards that [are] set under this supervisory authority are not satisfied by observance of those minimal historic safeguards for securing trial by reason which are summarized as due process of law . . . . Rather, the standards are flexible and are to be determined in the interests of justice. . . . [O]ur supervisory authority [however] is not a form of free-floating justice, untethered to legal principle. . . . Rather, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers. . . . [O]ur supervisory powers are invoked only in the rare circumstance where [the] traditional protections are inadequate to ensure the fair and just administration of the courts . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Santiago*, 245 Conn. 301, 332–33, 715 A.2d 1 (1998).

that the state's attorney provided for challenging M.B. was a pretext for discrimination.[12]

Even if it is assumed, arguendo, that the trial court properly rejected the state's peremptory challenge against M.B. on the ground that the reasons given by the state's attorney for striking M.B. were inadequate, we nevertheless decline the defendant's invitation to exercise our supervisory power to require sua sponte reconsideration by the trial court of its earlier ruling rejecting the defendant's *Batson* challenge.[13] We do so

[12] After the trial court indicated that it did not accept the explanation the state's attorney gave for seeking to exercise a peremptory challenge against M.B., the state withdrew its challenge and M.B. was seated on the jury. The defendant raises no claim regarding the state's effort to strike M.B. apart from the contention that the trial court's alleged finding of pretext in connection with the state's attorney's explanation for challenging M.B. required the court, sua sponte, to reconsider its earlier rejection of the defendant's *Batson* challenge to the state's peremptory challenge against J.J.

[13] In fact, our review of the record indicates that the trial court's rejection of the state's peremptory challenge against M.B. was predicated upon an improper application of *Batson*. Specifically, the reasons advanced by the state's attorney for seeking to strike M.B.—primarily M.B.'s educational background and the state's attorney's difficulty in communicating with her— were race neutral. Moreover, the court expressly found that the state's attorney sincerely believed that those reasons provided a proper basis upon which to strike M.B. from the jury panel, and, furthermore, that the state's attorney was "entitled to believe" the proffered reasons. Nevertheless, the trial court indicated that, in its view, the reasons proffered by the state's attorney were not, in fact, supported by M.B.'s responses. Consequently, the trial court reluctantly concluded that the state's exercise of a peremptory challenge against M.B. was impermissible. The trial court, therefore, employed a standard that was overly demanding of the state. The question for the trial court was whether the state's articulated reasons were *pretextual, not whether the trial court deemed the reasons to be adequately supported by the record.*

Therefore, because the record clearly indicates that the trial court did not believe that the state's motive in seeking to exercise a peremptory challenge against M.B. was based on M.B.'s race, it appears that the trial court improperly sustained the defendant's claim regarding that challenge. We need not base our determination of this issue on the court's erroneous application of *Batson*, however, because we conclude that the defendant is not entitled to the relief that he seeks, even if we assume, arguendo, that the state sought to exercise a peremptory challenge against M.B. in violation of the principles enunciated in *Batson* and its progeny.

because the defendant, not the trial court, properly bears the burden of raising the issue of whether the court's subsequent finding of pretext calls into question the validity of the court's earlier ruling upholding the state's use of a peremptory challenge against a previous venireperson. Of course, if warranted under the circumstances, the trial court may, sua sponte, reconsider its previous ruling rejecting the defendant's earlier *Batson* challenge. Moreover, the defendant is free to seek reconsideration of any such ruling at any time prior to the conclusion of jury selection. See *State* v. *Robinson,* supra, 237 Conn. 250. In light of the significant period of time that it often takes to select a jury and the large number of potential jurors frequently involved in that process, however, it would be unfair to *require* the court to undertake a sua sponte review of its prior *Batson* ruling or rulings solely because the court thereafter determines that, with respect to a subsequent venireperson, the prosecutor's explanation for exercising a peremptory challenge does not pass muster under *Batson.* We, therefore, reject the defendant's claim that we should invoke our supervisory authority in the circumstances of this case.

II

The defendant next claims that the trial court failed to make an adequate inquiry into allegations of juror bias in violation of his right to a fair trial guaranteed under the sixth and fourteenth amendments[14] to the United States constitution and article first, § 8,[15] of the Connecticut constitution. We reject this claim.

[14] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ."

The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[15] Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right . . . to a speedy, public trial by an impartial jury. . . ."

The following additional facts are relevant to our resolution of this issue. Following the trial court's final instructions, the jury was excused for lunch prior to commencing its deliberations. After the lunch recess, the court indicated that it wished to place on the record a matter that it had discussed in chambers with defense counsel and the state's attorney. The court stated that, during the recess, an alternate juror, subsequently identified as the first alternate juror, J.D., had approached a deputy sheriff stationed at the metal detector outside the courthouse. According to the court, J.D. had indicated to the deputy sheriff that "either he . . . or other members of the jury have been intimidated about what he describes as friends of the defendant."

The trial court indicated that it intended to question J.D. about the matter individually and on the record. The court asked defense counsel and the state's attorney if they had any objection to proceeding in that manner, or if they wished to suggest an alternative approach. Neither party objected to the procedure the court had suggested. The defendant, however, inquired whether it might be preferable first to interview the deputy sheriff who had reported J.D.'s comment to the court. The trial court explained that it would not be productive to do so, stating that: "I talked to the [deputy] sheriff and, to be honest, the information was . . . very sketchy . . . . I don't think he probed or asked [J.D.] any questions."

The court, in the presence of both defense counsel and the state's attorney, then proceeded to question J.D. about whether he had made a comment to the deputy sheriff regarding possible intimidation of the jury by the defendant's friends. J.D. responded that he had "asked the [deputy] sheriff what could be done in the event that—that I felt intimidated by the presence of—of maybe known associates of the defendant." The court asked what, if anything, had occurred to cause

him to make this inquiry. J.D. responded that he had spoken to the deputy sheriff because of the "looks and presence" of suspected associates of the defendant, both inside the courtroom and on the steps outside the courthouse. The court then inquired of J.D. whether other jurors shared the same "feeling" about these individuals. J.D. responded in the affirmative, adding that "it's been noticed and mentioned" by other jurors. When questioned by the court as to whether any such person had spoken to any of the jurors, J.D. responded: "No, nothing has been said to any jurors at all." At defense counsel's request, the court then asked J.D. what had caused him to believe that these individuals were friends or associates of the defendant. J.D. responded that, on two days during the course of the trial, he had observed two men seated in the second row of the courtroom, whom he assumed were friends of the defendant.

Upon completing its questioning of J.D., the court indicated that it intended to question each juror, individually and outside the presence of the other jurors, about whether anything had occurred during the trial, either inside or outside the courtroom, that might affect any juror's impartiality. Neither party voiced any objection to this procedure, and the court thereupon questioned the jurors accordingly.[16] Each juror responded to the court's inquiry in the negative. The trial court then asked whether either party had anything it wished to state for the record. Defense counsel stated that he believed that J.D.'s concerns appeared to be unfounded. The trial court agreed, stating that any juror who felt that he or she could not be fair would have said so in response

---

[16] The trial court informed the parties that it did not intend to question the jurors specifically about the subject matter of J.D.'s report to the court. Rather, the court indicated that it intended to inquire generally of the jurors whether anything had occurred that would have affected their ability to be fair and impartial. Neither party objected to this approach.

to the court's questioning. The court then asked the defendant if he had anything further to add, and defense counsel stated that he did not.

Thereafter, the court instructed the jury to commence its deliberations. After so instructing the jury, the trial court again afforded the defendant an opportunity to voice any concerns he might have had regarding the issue of possible juror bias. The defendant raised no objection to the procedure employed by the court or to the commencement of jury deliberations. The jury subsequently returned its verdict of guilty.

After the jury verdict, the defendant filed a motion seeking, inter alia, a new trial on the ground that the "limited colloquy undertaken by the [c]ourt was insufficient to discover what other [j]urors," in addition to J.D., might have felt intimidated by persons they believed were friends of the defendant. The defendant also claimed in his motion that the court's inquiry was inadequate to establish whether any of the jurors had discussed the matter, and how any juror other than alternate juror J.D. might have been led to suspect that the men identified by J.D. were friends of the defendant. The trial court denied the defendant's motion.

"Jury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution. . . . [T]he right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. . . . The modern jury is regarded as an institution in our justice system that determines the case solely on the basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court." (Internal quotation marks omitted.) *State* v. *Rhodes*, 248 Conn. 39, 46, 726 A.2d 513 (1999); accord *State* v. *Santiago*, 245 Conn. 301, 330, 715 A.2d 1 (1998).

To ensure that the jury "will decide the case free from external influences that might interfere with the exercise of deliberate and unbiased judgment"; (internal quotation marks omitted) *State* v. *Rhodes*, supra, 248 Conn. 47; a trial court is required to conduct a preliminary inquiry, on the record, whenever it is presented with information tending to indicate the possibility of juror misconduct or partiality.[17] See, e.g., *State* v. *Brown*, 235 Conn. 502, 526, 668 A.2d 1288 (1995). We previously have "instructed that the trial court should consider the following factors in exercising its discretion as to the form and scope of a preliminary inquiry into allegations of jury misconduct: (1) the criminal defendant's substantial interest in his constitutional right to a trial before an impartial jury; (2) the risk of deprivation of the defendant's constitutional right to a trial before an impartial jury, which will vary with the seriousness and the credibility of the allegations of jury misconduct; and (3) the state's interests of, inter alia, jury impartiality, protecting jurors' privacy and maintaining public confidence in the jury system." *State* v. *Santiago*, supra, 245 Conn. 331.

"Any assessment of the form and scope of the inquiry that a trial court must undertake when it is presented with allegations of jury [bias or] misconduct will necessarily be fact specific. No one factor is determinative as to the proper form and scope of a proceeding. It is the trial court that must, in the exercise of its discretion, weigh the relevant factors and determine the proper balance between them." *State* v. *Brown*, supra, 235 Conn. 531–32. Consequently, the trial court has wide latitude in fashioning the proper response to allegations of juror bias. Id., 523–24; see *State* v. *Ross*, 230 Conn.

---

[17] Indeed, in light of the paramount importance of the interests at stake, the trial court is obligated to conduct such an inquiry regardless of whether it is requested by the parties. *State* v. *Brown*, 235 Conn. 502, 526, 668 A.2d 1288 (1995).

183, 227–28, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995); *State* v. *Rodriguez*, 210 Conn. 315, 326, 554 A.2d 1080 (1989). "We [therefore] have limited our role, on appeal, to a consideration of whether the trial court's review of alleged jury misconduct can fairly be characterized as an abuse of its discretion." *State* v. *Brown*, supra, 524. Although we recognize that trial "[c]ourts face a delicate and complex task whenever they undertake to investigate reports of juror misconduct or bias"; *United States* v. *Thomas*, 116 F.3d 606, 618 (2d Cir. 1997); we nevertheless "have reserved the right to find an abuse of discretion in the highly unusual case in which such an abuse has occurred." *State* v. *Brown*, supra, 524. Ultimately, however, "[t]o succeed on a claim of [juror] bias the defendant must raise his contention of bias from the realm of speculation to the realm of fact." (Internal quotation marks omitted.) *State* v. *Myers*, 242 Conn. 125, 141, 698 A.2d 823 (1997).

The defendant has failed to demonstrate that the hearing conducted by the trial court was inadequate to safeguard his right to a trial before an impartial jury. The court's questioning of alternate juror J.D. revealed that J.D.'s "feelings" about possible intimidation by two suspected friends of the defendant were not founded upon any articulable facts or circumstances. J.D. expressly acknowledged that neither he nor any other juror had communicated with any such person or persons. Indeed, the only reason offered by J.D. for suspecting that the two unidentified men were associated with the defendant is the fact that they had been seated in the second row of the courtroom on two of the days of trial. Moreover, each juror, upon individual questioning by the court outside the presence of the other jurors, stated that nothing had occurred during the trial to affect his or her impartiality or objectivity.

The defendant's primary claim is that the trial court's inquiry of the individual jurors was so general that it was inadequate to determine whether the jurors were influenced in some way by the presence of the two suspected friends of the defendant. It is true that the trial court did not question the jurors about the specific information that J.D. reported to the court, but, rather, inquired generally as to whether anything had occurred during the trial that might have compromised the jurors' impartiality. In light of the vague and speculative nature of the information elicited from J.D., however, and in the absence of a response from any juror tending to suggest even the possibility of juror bias, the trial court was not required to conduct a more fact-specific inquiry. Indeed, such questioning might have raised concerns in the minds of jurors when none previously had existed. Finally, defense counsel's failure to seek any additional questioning or investigation by the court, despite repeated opportunities to do so, belies the defendant's assertion on appeal regarding the inadequacy of the court's action. Contrary to the defendant's claim, therefore, we conclude that the hearing conducted by the trial court fully comported with the defendant's right to a trial by an impartial jury.

## III

The defendant next claims that the trial court improperly permitted the state to introduce into evidence a witness' prior inconsistent written statement for substantive purposes. The state contends that the statement was admissible under the rule of *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), which allows the "substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testi-

fies at trial and is subject to cross-examination."[18] We agree with the state that the trial court properly permitted the state to use the witness' statement under *Whelan*.

The following additional facts are relevant to our resolution of this claim. On direct examination by the state, Sierra testified about the shooting. He also stated that he had been interviewed by officers of the Bridgeport police department after the incident. Sierra recalled accompanying the police to the police garage and identifying the vehicle from which the person who had shot Horeglad emerged. Sierra further testified that the police had shown him a photographic array and asked him whether the photograph of the shooter appeared in the array. Sierra testified that he had selected the defendant's photograph from the array and that he had circled that photograph on a photocopy of the array. Sierra also insisted, however, that he had told the police that he was not certain about the identification, and that all he could say was that the shooter looked similar to the person depicted in the photograph that he had selected. Sierra further indicated that he had told the police that he recognized the shooter because he previously had seen the shooter riding around in his car.[19] Sierra also testified that he had given the police a written, signed statement about the shooting the day after the incident.

Sierra then was asked whether the person he had selected from the photographic array was present in the courtroom and Sierra responded that he saw someone who looked similar to that person. When questioned as to whether the person who shot the victim was in

[18] A prior, tape-recorded statement that satisfies these conditions also is admissible for substantive purposes. *State* v. *Whelan*, supra, 200 Conn. 754 n.9.

[19] Sierra first denied that he had told the officers that he previously had seen the shooter riding around in his car.

the courtroom, however, Sierra replied "[n]o." Sierra thereafter acknowledged that he had told members of the office of the state's attorney that he was afraid and did not want to testify in the case.

The state's attorney then showed Sierra a document that Sierra identified as the written, signed statement that he had given to the police the day after the shooting. In Sierra's three page statement, he indicated that he was sure that the photograph that he had selected from an array of fifteen African-American males was the photograph of the person who had shot Horeglad. Sierra also stated that he had identified the car from which the shooter had emerged and, further, that he had "seen that car before in the neighborhood with [the shooter] driving it."[20]

The state sought to introduce the statement as substantive evidence under *Whelan* and the defendant objected. The trial court then excused the jury.

Outside the presence of the jury, Sierra again identified the document as the statement he had given to the police about the shooting.[21] Sierra testified that he had signed the statement because it contained "the questions [the officer] had asked me and I had answered . . . ."

On cross-examination, however, Sierra gave other reasons for why he had signed the statement. Specifi-

---

[20] According to Sierra's statement, he has a ninth grade education and can read and write English. Sierra also indicated in the statement that he had read the statement and signed it after finding it to be true. Finally, the statement contains the following warning near the top of the first page: "THE GIVING OF A FALSE STATEMENT, AND/OR THE TAMPERING WITH OR FABRICATION OF PHYSICAL EVIDENCE IS IN VIOLATION OF THE EXISTING LAWS OF THE STATE OF CONNECTICUT AND ARE PUNISHABLE UNDER SECTIONS 53A-155 AND 53A-157 OF THE CONNECTICUT GENERAL STATUTES."

[21] Sierra explained that the interviewing officer had typed the questions and answers, and then asked Sierra to read and sign the document if he found it to be accurate.

cally, he indicated that he felt pressure to do so because the interviewing officer had led him to believe that they would not return his parents' car, which had been seized after the shooting, until he gave the statement. Sierra further testified that he had just glanced at the statement before signing it, and that certain things that he had told the officer were not contained therein. Sierra also claimed that he was under the influence of heroin and crack cocaine when he signed the statement. In addition, Sierra testified that the officer had offered to help him with a narcotics case that was pending against him when he made the statement, and that those charges later were nolled when he returned to court. Finally, Sierra stated that the police had repeatedly asked him to look at the photographic array, and that he eventually had selected the defendant's photograph "to get them off [his] back." During the course of his cross-examination, however, Sierra also testified that he had signed the statement because it accurately reflected his answers, that he had read each and every question and answer contained in the statement and that he had signed the statement knowingly and voluntarily and with an understanding of the questions and answers.

Donald A. Jacques, a Bridgeport police detective, also testified outside the presence of the jury. Jacques stated that Sierra had spoken to the police on the day of the shooting and, after learning of further information that implicated the defendant, Jacques and Sergeant Paul Carlson went to Sierra's home the day after the shooting. At that time, Sierra was shown a photographic array and asked whether the shooter's photograph was contained therein. Sierra, who appeared hesitant and afraid, glanced quickly at the photographic array and asserted that he could not recognize anyone and that he did not want to be involved any further. After a brief discussion with the officers, however, Sierra agreed to

examine the photographs, and he identified the photograph of the defendant as that of the shooter. Sierra then accompanied the officers to the police station, where he again identified the defendant's photograph.

While at the station, Sierra also answered Jacques' questions regarding the shooting. Thereafter, Sierra signed a written statement containing those questions and answers.[22] According to Jacques, "[t]here was no pressure put on" Sierra either to identify the defendant as the shooter or to give a statement.[23] Specifically, Jacques testified that Sierra never was told that his parents' car would be released if he gave a statement; rather, Sierra was informed that the vehicle would be returned after it had been processed by the department's identification division. Jacques further testified that he was unaware that Sierra had pending narcotics charges. Finally, Jacques stated that Sierra "appeared normal . . . [and] was coherent" when he gave his statement.

Following Jacques' testimony outside the jury's presence, the defendant argued that the state should be barred from using Sierra's statement. Specifically, the defendant maintained that the statement was unreliable because, according to Sierra, he had been pressured into giving it and was under the influence of narcotics when he did so. The trial court overruled the defendant's objection, finding the "circumstances under which the statement was taken and the identification of the photographs to be reliable." The court also indicated that the credibility of Sierra's trial testimony and his

---

[22] Jacques stated that he, alone, had questioned Sierra about the shooting, and that Lieutenant Richard Petitte had notarized Sierra's signature on the statement.

[23] Immediately thereafter, Jacques testified that "[t]he only pressure [that] was put on him was just to do the right thing . . . if you want to call that pressure . . . ."

prior written statement ultimately was a determination to be made by the jury.

We begin our analysis of the defendant's claim by noting that, prior to 1986, we had adhered to the "traditional view that a prior inconsistent statement of a nonparty witness is inadmissible hearsay if offered to prove the truth of the matters asserted therein and, therefore, is admissible only for impeachment purposes."[24] (Internal quotation marks omitted.) *State* v. *Hopkins*, 222 Conn. 117, 122–23, 609 A.2d 236 (1992). "In *State* v. *Whelan*, [supra, 200 Conn. 743, however] . . . we carefully considered the rationale for the common law prohibition on the substantive use of prior inconsistent statements and the criticisms of that rule. We noted that [t]he logic of [the] orthodox rule is that the prior inconsistent statement of a witness is too unreliable to be admitted as substantive evidence because the declarant was not (1) under oath and subject to punishment for perjury, (2) in the presence of the trier of fact, or (3) subject to cross-examination. [Id.], 749. We acknowledged, however, the view of many scholars and commentators that the oath is not as strong a guaranty of trustworthiness as it once may have been, and that the requirements that the jury observe the declarant and that the defendant have the opportunity to cross-examine are met when the declarant takes the stand and is subject to cross-examination. . . . [Id.], 749–50.

"Further, we agreed with several commentators that when the declarant is available for cross-examination the jury has the opportunity to observe him as he repudiates or varies his former statement. The cross-examination to which a recanting witness will be subjected is

---

[24] "An out-of-court statement offered to prove the truth of the matter asserted is hearsay and is generally inadmissible unless an exception to the general rule applies." *State* v. *Hines*, 243 Conn. 796, 803, 709 A.2d 522 (1998).

likely to be meaningful because the witness will be forced either to explain the discrepancies between the earlier statements and his present testimony, or to deny that the earlier statement was made at all. If, from all that the jury sees of the witness, [it] conclude[s] that what he says now is not the truth, but what he said before, [it is] none the less deciding from what [it] see[s] and hear[s] of that person and in court. . . . The jury can, therefore, determine whether to believe the present testimony, the prior statement, or neither. . . . Id., 750.

"We concluded that the prevailing reasons for refusing to allow any prior inconsistent statement to be used as substantive evidence are no longer valid; id., 752; and that an exception to the hearsay rule was appropriate where the statements are made under conditions deemed to render them equal in reliability and trustworthiness to those made under the sanction of an oath and the test of cross-examination. . . . Id. In this regard, however, we declined to follow the modern view favoring substantive admissibility for all prior inconsistent statements where the [declarant] is in court and subject to cross-examination, concluding that certain additional criteria of admissibility were appropriate to ensure the reliability of such statements for substantive use. Id. Noting the many hazards associated with the reporting and use of prior oral statements; see id., 753–54; we adopted a rule allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination. Id., 753." (Citations omitted; internal quotation marks omitted.) *State* v. *Newsome*, 238 Conn. 588, 601–603, 682 A.2d 972 (1996). In refusing to adopt a broader hearsay exception applicable to all prior inconsistent statements, we expressly noted that "[t]he hazard of error is greatly lessened with respect to prior inconsistent written statements signed by the

declarant"; *State* v. *Whelan*, supra, 200 Conn. 753–54; and indicated that, in such circumstances, "the likelihood of fabrication is slight and the risk of coercion, influence or deception is greatly reduced." Id., 753. Thus, "[w]hile we noted that the requirement that prior statements be written and signed is not an absolute guaranty of reliability, it does provide significant assurance of an accurate rendition of the statement and that the declarant realized it would be relied upon. Id., 754."[25] (Internal quotation marks omitted.) *State* v. *Grant*, 221 Conn. 93, 100, 602 A.2d 581 (1992); accord *State* v. *McDougal*, 241 Conn. 502, 508, 699 A.2d 872 (1997).

The defendant concedes that Sierra's statement satisfies the four *Whelan* requirements, namely, that: (1) the prior inconsistent statement was in writing; (2) Sierra signed the statement; (3) Sierra had personal knowledge of the facts contained in the statement; and (4) Sierra testified at trial and was subject to cross-examination. See *State* v. *Whelan*, supra, 200 Conn. 753. The defendant, however, claims that the trial court improp-

---

[25] As we recently have reiterated, the *Whelan* "criteria, particularly cross-examination, provide substantial assurance of reliability. 'The witness who has told one story aforetime and another today has opened the gates to all the vistas of truth which the common law practice of cross-examination and re-examination was invented to explore. The reasons for the change of face, whether forgetfulness, carelessness, pity, terror, or greed, may be explored by the two questioners in the presence of the trier of fact, under oath, casting light on which is the true story and which the false. It is hard to escape the view that evidence of a prior inconsistent statement when the declarant is on the stand to explain it if he can, has in high degree the safeguards of examined testimony.' 2 C. McCormick, Evidence [4th Ed. 1992] § 251, p. 120. As was noted by Judge Learned Hand, in observing that juries are fully capable of determining the credibility of a witness' out-of-court statements that are inconsistent with his trial testimony, '[t]here is no mythical necessity that the case must be decided only in accordance with the truth of the words uttered under oath in court.' *Di Carlo* v. *United States*, 6 F.2d 364, 368 (2d Cir. 1925). 'If, from all that the jury see[s] of the witness, [it] conclude[s] that what he says now is not the truth, but what he said before, [it is] none the less deciding from what [it] see[s] and hear[s] of that person in court.' Id." *State* v. *Newsome*, supra, 238 Conn. 610.

erly concluded that Sierra's statement was sufficiently reliable to be used by the state as substantive evidence under *Whelan*. We disagree. Moreover, we believe that the defendant's argument reflects a fundamental misperception of the thrust of *Whelan* and its progeny.

In *Whelan*, we carved out a hearsay exception for a relatively narrow category of prior inconsistent statements. As discussed previously, we carefully limited the exception to those prior statements that carry such substantial indicia of reliability as to warrant their substantive admissibility. As with any statement that is admitted into evidence under a hearsay exception, a statement that satisfies the *Whelan* criteria may or may not be true *in fact*. But, as with any other statement that qualifies under a hearsay exception, it nevertheless is admissible to establish the truth of the matter asserted because it falls within a class of hearsay evidence that has been deemed sufficiently trustworthy to merit such treatment. Thus, as with all other admissible nonhearsay evidence, we allow the fact finder to determine whether the hearsay statement is credible upon consideration of all the relevant circumstances. Consequently, once the proponent of a prior inconsistent statement has established that the statement satisfies the requirements of *Whelan*, that statement, like statements satisfying the requirements of other hearsay exceptions, is presumptively admissible.

Of course, a prior inconsistent statement that fulfills the *Whelan* requirements may have been made under circumstances so unduly coercive or extreme as to grievously undermine the reliability generally inherent in such a statement, so as to render it, in effect, not that of the witness. In such circumstances, the trial court must act as a gatekeeper to ensure that the statement does not go to the jury for substantive purposes. We emphasize, however, that the linchpin of admissibility is reliability: the statement may be excluded as sub-

stantive evidence only if the trial court is persuaded, in light of the circumstances under which the statement was made, that the statement is so untrustworthy that its admission into evidence would subvert the fairness of the fact-finding process.[26] In the absence of such a showing by the party seeking to exclude a statement that meets the *Whelan* criteria,[27] the statement is admissible as substantive evidence;[28] like all other evidence, its credibility is grist for the cross-examination mill. Thus, because the requirements that we established in *Whelan* provide a significant assurance of reliability,[29] it will be the highly unusual case in which a statement that meets the *Whelan* requirements nevertheless must be kept from the jury.[30]

[26] Of course, the trial court's factual findings on this issue will not be disturbed on appeal unless they are clearly erroneous.

[27] Thus, we suggest the following procedure to our trial courts: If a statement meets the four *Whelan* requirements, it will be deemed admissible, unless the party seeking to exclude it makes a preliminary showing of facts that, if proven true, would grievously undermine the statement's reliability. If such a showing has been made—and we leave the methods and contours of such a showing to the discretion of the trial court—the court should then hold a hearing to determine the truth of those facts and whether they do, in fact, grievously undermine the reliability of the statement. The ultimate question for the trial court, therefore, is whether, notwithstanding the statement's satisfaction of the *Whelan* requirements, the circumstances under which the statement was made nonetheless render it so unreliable that a jury should not be permitted to consider it for substantive purposes.

[28] Of course, a *Whelan* statement is subject to the rules governing all other evidence, and may be excluded if it is irrelevant, cumulative or the like.

[29] As we previously have noted, statements that comply with the *Whelan* criteria generally "provid[e] a reasonable assurance of reliability"; *State* v. *Borrelli*, 227 Conn. 153, 159, 629 A.2d 1105 (1993); and, therefore, "should be admitted *to advance the truth finding function of the jury*." (Emphasis added.) Id.; see also *State* v. *Newsome*, supra, 238 Conn. 622 ("We are satisfied that the requirements we imposed in *Whelan* adequately assure the reliability of prior inconsistent statements in order properly to put such a statement before the jury. In our view, the factors advanced by the defendant properly go to the weight to be afforded such a statement in light of the totality of the evidence adduced.").

[30] We recently have commented upon the practical considerations that also played a part in our adoption of the *Whelan* rule, including the fact that the police frequently obtain "statements from eyewitnesses to violent

This case clearly is not such a case. Sierra testified that he signed his statement to the police after reading it and finding it to be true. Jacques testified that there was no improper pressure placed on Sierra to make either the statement or the identification and, further, that Sierra was coherent and acted normally when the statement was made. Thus, the trial court properly concluded that Sierra's assertions that he was under the influence of narcotics and felt pressured by the police to make both the statement and the identification were "relevant and proper matters for cross-examination . . . [that] go to the weight of the evidence and not its admissibility."[31] *State* v. *Hopkins*, supra, 222 Conn. 125. We, therefore, reject the defendant's *Whelan* claim.

## IV

Finally, the defendant claims that the court improperly instructed the jury on reasonable doubt and the presumption of innocence in violation of his due process right to a fair trial. We disagree with both of these contentions.[32]

and fearful crimes. Unfortunately, in an atmosphere of violence, such witnesses may wish to say nothing or, if they do, later say they saw nothing. The *Whelan* principle's growing acceptance in our law; see 3A J. Wigmore, Evidence (Sup. 1996) § 1018; is but a reflection of that sad reality." *State* v. *McDougal*, supra, 241 Conn. 509. The fact that many witnesses who recant statements that satisfy the *Whelan* requirements do so not because the statements are false, but, rather, because they fear reprisal or retaliation, buttresses our conclusion that such statements may be excluded only upon a compelling showing of untrustworthiness.

[31] "The admissibility of evidence, including the admissibility of a prior inconsistent statement pursuant to *Whelan*, is a matter within the wide discretion of the trial court. . . . On appeal, the exercise of that discretion will not be disturbed except on a showing that it has been abused." (Citation omitted.) *State* v. *Newsome*, supra, 238 Conn. 596.

[32] The defendant failed to object at trial to the jury instructions that he now challenges on appeal. Because the record is adequate for our consideration of the defendant's claims, we address them in accordance with the principles set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), which govern our review of unpreserved constitutional claims.

The defendant first asserts that the trial court, in its preliminary instructions to the venirepanel from which the jury in this case ultimately was selected, improperly explained the concept of reasonable doubt. Specifically, the defendant challenges the statement of the court that a reasonable doubt is "a doubt for which you can give or assign a reason. Something you can explain to somebody."

We previously have concluded that an instruction describing reasonable doubt as "a doubt for which you can give or assign a reason"—or an instruction that is substantially similar thereto—does not diminish the state's burden of proof when considered in the context of the charge as a whole.[33] E.g., *State* v. *Ellis*, 232 Conn. 691, 705, 657 A.2d 1099 (1995); *State* v. *Williams*, 231 Conn. 235, 254 n.22, 645 A.2d 999 (1994); *State* v. *Gomez*, 225 Conn. 347, 353–54 & n.8, 622 A.2d 1014 (1993). Although we have disapproved of language providing that reasonable doubt is a doubt that a juror can "explain"; e.g., *State* v. *Jeffrey*, 220 Conn. 698, 719, 601 A.2d 993 (1991), cert. denied, 505 U.S. 1224, 112 S. Ct. 3041, 120 L. Ed. 2d 909 (1992); *State* v. *Ireland*, 218 Conn. 447, 457, 590 A.2d 106 (1991); we also have held that the use of such language does "not render an otherwise adequate instruction on reasonable doubt constitutionally defective." *State* v. *Jeffrey*, supra, 719. Because our review of the trial court's preliminary and final jury instructions on reasonable doubt reveals that those

---

[33] "When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is . . . whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Leroy*, 232 Conn. 1, 8, 653 A.2d 161 (1995); accord *State* v. *Denby*, 235 Conn. 477, 484–85, 668 A.2d 682 (1995).

instructions otherwise were accurate in all respects, we reject the defendant's claim of a due process violation.

The defendant also challenges the following portion of the trial court's final instructions: "It is the sworn duty of the courts and the jurors to safeguard the rights of persons charged of a crime by respecting the presumption of innocence which the law gives every person so charged, *but the law is made to protect society and those whose guilt has not been established beyond a reasonable doubt and not to protect those whose guilt has been so established.*" (Emphasis added.) The defendant contends that this instruction, which was contained in the court's thorough charge on reasonable doubt and the presumption of innocence, impermissibly diluted the state's burden of proof. We disagree.

In *State* v. *Francis*, 228 Conn. 118, 635 A.2d 762 (1993), we considered a claim that the following language, contained in the court's jury instructions on reasonable doubt and the presumption of innocence, was improper: "But the law is made to protect society and innocent persons, and not to protect guilty ones." (Internal quotation marks omitted.) Id., 135. We rejected the defendant's claim, concluding that the challenged language was not likely to have been misleading in view of the context in which that particular language appeared in the court's charge.[34] See id., 135–36 & n.19.

---

[34] We explained our conclusion as follows: "The challenged language—'[b]ut the law is made to protect society and innocent persons, and not to protect guilty ones'—is immediately preceded by language emphasizing the presumption of innocence: 'It is the sworn duty of the court and jurors to safeguard the rights of persons charged with crime by respecting the presumption of innocence.' It is immediately followed by language emphasizing the jurors' duty when guilt has been proven beyond a reasonable doubt: 'If and when the presumption of innocence has been overcome by evidence proving guilt beyond a reasonable doubt that an accused person is guilty of the crime charged . . . then it is the sworn duty of the jury to enforce the law, and to render a verdict of guilty.' Under these circumstances, it is unlikely that a reasonable juror would have heard the challenged language as meaning anything more than the language that followed it, namely, that if the jurors were convinced of the defendant's guilt beyond a reasonable

We nevertheless indicated that "because of the possibility that a juror might hear the language differently, and might be given to understand from it that only innocent persons should be acquitted, we suggest that either: (1) the challenged sentence be omitted;[35] or (2) it be modified to provide as follows: *'But the law is made to protect society and persons whose guilt has not been established beyond a reasonable doubt, and not to protect those whose guilt has been so established.'* " (Emphasis added.) Id., 136 n.19. This suggested alternative language is virtually identical to the language that the trial court used in this case.[36] We are satisfied that this language fully comports with the protections guaranteed by the standard of reasonable doubt and the presumption of innocence, and the defendant makes no persuasive argument to the contrary. Accordingly, the defendant's claim of instructional impropriety also must fail.

The judgment is affirmed.

In this opinion the other justices concurred.

doubt, they are obligated to convict." *State* v. *Francis,* supra, 228 Conn. 136 n.19.

[35] We subsequently have exercised our supervisory authority over the administration of justice to prohibit the use of such language by our trial courts. *State* v. *Schiappa,* 248 Conn. 132, 175, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999).

[36] We note that the state emphasizes the importance of such language because it underscores the principle that a juror has no right to ignore the court's instructions by refusing to convict a defendant whose guilt has been established beyond a reasonable doubt. See, e.g., *United States* v. *Thomas,* supra, 116 F.3d 615 (although jury has *power* to engage in "nullification" by refusing to follow court's instructions, it has no *right* to do so). We agree with the state that it has a strong and legitimate interest in having the jury apprised that it is not free to reject the court's instructions and, furthermore, that the jury is equally obligated to acquit those whose guilt the state has not established beyond a reasonable doubt and to convict those whose guilt has been so proven. However, the decision whether to convey these principles by using the language that we approved in *State* v. *Francis,* supra, 228 Conn. 136 n.19, as the trial judge did in this case, is a matter within the sound discretion of the trial court.