******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ANDREW DICKSON
(AC 35542)

Lavine, Keller and Flynn, Js.

*Argued March 13—officially released June 3, 2014*

(Appeal from Superior Court, judicial district of
Fairfield, Thim, J.)

*Andrew S. Liskov*, for the appellant (defendant).

*Katherine E. Donoghue*, special deputy assistant
state's attorney, with whom, on the brief, were *John
C. Smriga*, state's attorney, and *Joseph T. Corradino*,
senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Andrew Dickson, appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (1), and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (4). On appeal, the defendant claims that the trial court's rulings with regard to (1) the in-court identification made by the complaining witness, (2) juror misconduct, and (3) the charge to the jury constituted an abuse of its discretion and thereby violated his state and federal constitutional rights. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts beyond a reasonable doubt. Sometime prior to January 9, 2010, Akeem Lyles placed an advertisement on Craigslist offering to sell an all-terrain vehicle.[1] Lyles had no intention of selling such a vehicle, however, but planned to rob the person who arrived at an agreed upon location intending to purchase the vehicle.[2] On January 3, 2010, Albert Weibel, a Massachusetts resident, and Matthew Shaw responded via e-mail to Lyles' Craigslist advertisement. Lyles communicated with Weibel via telephone, but he did not give Weibel his name. The two arranged to meet at Terrace Circle in Bridgeport on the night of January 9, 2010. Weibel and Shaw borrowed a pickup truck and drove to Terrace Circle as agreed. When they arrived at Terrace Circle, it was dark, and no one was present. They waited approximately ten minutes until Weibel called Lyles. Weibel stated that he was waiting outside with a friend.

At the time, Lyles was in a nearby apartment with Giovanni Reyes and the defendant. Lyles explained his plan to the two men and asked if they wanted to join him because he needed help controlling more than one victim. Reyes and the defendant agreed. They left the apartment armed with guns Lyles provided at approximately 9:30 p.m. Lyles had a .40 caliber Smith and Wesson handgun; Reyes had a paintball gun that resembled an assault rifle. The defendant had a .38 special revolver.

Weibel called Lyles again. Lyles told him that he was "out back trying to unlock the quad . . . come around and check it out." Weibel took his flashlight, left the pickup, and walked between two nearby buildings. Shaw stayed in the pickup and observed three "black" men walk in Weibel's direction. Weibel turned right when he passed between two buildings. Lyles called out to him, asking if it were he with the flashlight. When Weibel responded affirmatively, Lyles told him to turn and walk in the other direction. Weibel walked to the other side; and when he was close to Lyles, Lyles put a gun to Weibel's head and demanded money. Weibel told him he had no money. He turned around and saw Reyes and the defendant with guns.[3] The men demanded

money of him. Weibel attempted to walk away, but the men hit him, demanded money, and took his cell phone. Weibel covered his head, called for help, and walked toward the pickup. As he got closer to the pickup, Lyles broke away from the group and pointed a gun at Shaw.

Shaw was nervous about the situation and was in the process of sending a text message to Weibel when Lyles tapped on the window of the pickup and pointed a gun at his head. Lyles told Shaw to get out of the pickup. As he was doing so, Lyles grabbed him and threw him against a parked car and screamed at him to give him the money. When Shaw informed Lyles that he did not have the money, Lyles took Shaw's cell phone and wallet. Lyles held a gun to the back of Shaw's head and continued to demand money. He also patted him down. Reyes found between $40 and $50, an iPod, and a global positioning system in the pickup and took them.

In the meantime, as Weibel kept trying to get to the pickup, Reyes and the defendant kept demanding money and kept hitting him. The defendant held a gun to Weibel's head and threw him against a dumpster near the pickup. Reyes looked through the pickup for money. One of the men yelled that "this is taking too long" and that the police would arrive soon and ran. The defendant stayed behind with his gun pointed at Weibel. The defendant stated to Weibel, "You're a dead man"; then shot Weibel in the leg and neck, and ran away. Shaw saw Weibel on the ground coughing up blood. He ran to hold Weibel and screamed for help.

The police arrived quickly. Paramedics arrived as well and took Weibel to a hospital, where he remained for eleven days. According to Vincent A. Manjoney, Jr., a physician, if Weibel had not received immediate medical attention, he would have bled to death. Approximately one year later, Weibel was unable to identify the person who shot him after viewing a police photographic array that included a photograph of the defendant.[4]

After the defendant shot Weibel, he met with Lyles and Reyes at the place they had been prior to the robbery. They borrowed a car and drove to "L's" house on Louis Street in south Bridgeport to avoid the police. Once there, Lyles asked the defendant why he had shot "the guy" and where he had shot him. The defendant replied that he "shot him in his leg and in his head because we didn't get any money."

The defendant was arrested and charged with attempt to commit murder in violation of General Statutes §§ 53a-49 and 53a-54 (a), assault in the first degree in violation of § 53a-59 (a) (1), conspiracy to commit robbery in the first degree in violation of §§ 53a-48 and 53a-134 (a) (4), and two counts of robbery in the first degree in violation of § 53a-134 (a) (4). The jury found him guilty of assault in the first degree and conspiracy

to commit robbery. The jury found him not guilty of the other charges. The court sentenced the defendant to an effective term of twenty-five years in prison, followed by ten years of special parole. Thereafter, the defendant appealed.

I

The defendant first claims that his state and federal rights to due process were denied when the court abused its discretion by permitting the complaining witness to identify him in court by means of a procedure that he claims is unnecessarily suggestive.[5] We disagree.

The following procedural history is relevant to the defendant's claim. Prior to the presentation of evidence on August 31, 2012, the defendant filed a motion in limine, pursuant to article first, § 8, of the constitution of Connecticut, to preclude Shaw and Weibel from making an in-court identification of him. In his motion to preclude, the defendant asserted that the in-court identification procedure typically employed in criminal matters where the defendant is seated at counsel table is unnecessarily suggestive. He further contended that that identification procedure is conducive to such irreparable misidentifications as to render them constitutionally unreliable and a violation of his state right to due process of law. The defendant requested that an alternative identification procedure be used, i.e., that the alleged perpetrator "be selected from a larger group of individuals who possess similar characteristics, including age, weight, complexion and hair style." After the jury had been selected and before the presentation of evidence, the defendant orally renewed his motion in limine. The court denied the motion in limine, stating that the identification would proceed in the "traditional manner."

On direct examination, Weibel testified that he was shot by an African-American male. He also identified the defendant, who was seated next to his defense counsel. On cross-examination, the defendant questioned Weibel about the location of the robbery, the lack of lighting, and Weibel's inability to identify the defendant from a photographic array presented to him by the police.

The state also presented testimony from Lyles, a cooperating witness. Lyles identified the defendant, whom he had known his entire life because their mothers were friends. He also testified that he told the defendant about his plan to rob Weibel and that the defendant wanted to participate in the robbery. He also testified that the defendant took a .38 special revolver to the robbery and held it to Weibel's head. As he was fleeing the scene, Lyles heard two gunshots, which he recognized as coming from a .38 special. When Lyles asked him, the defendant stated that he shot Weibel in the leg and head because the conspirators did not get any

money. Lyles' proffer and plea agreements were admitted into evidence, and both parties questioned him extensively about his understanding of them. During his cross-examination of Lyles, the defendant repeatedly pointed out numerous instances in which Lyles had been untruthful.[6] We now turn to the defendant's claim.

The law, presently, is clear that an in-court identification need not be excluded if it is not the product of an impermissible out-of-court identification. Although the "United States Supreme Court has set standards as to when a pretrial identification must be excluded and under what circumstances an in-court identification that follows an impermissible pretrial identification must be excluded . . . [that court] has not set any guidelines for in-court identification procedures or indicated that in-court identifications must be made in any way that is not suggestive. . . . Generally, an in-court testimonial identification need be excluded, as violative of due process, only when it is tainted by an out-of-court identification procedure which is unnecessarily suggestive and conducive to irreparable misidentification. . . . The Supreme Court has not extended its exclusionary rule to in-court identification procedures that are suggestive because of the trial setting. . . . There is no constitutional requirement that an in-court identification confrontation be conducted as a lineup or be otherwise free of suggestion." (Citations omitted; internal quotation marks omitted.) *State* v. *Smith*, 200 Conn. 465, 469–70, 512 A.2d 189 (1986).

In this case, there is no question that Weibel did not make an out-of-court identification of the defendant. We conclude, therefore, that pursuant to controlling precedents there was no due process basis on which to exclude Weibel's testimonial identification of the defendant at trial, and the court did not violate the defendant's constitutional rights.

We also conclude that the court did not abuse its discretion by denying the defendant's request for an alternate identification procedure. "The manner in which in-court identifications are conducted is not of constitutional magnitude but rests within the sound discretion of the trial court." Id., 470. The United States Supreme Court has stated: "It is part of our adversary system that we accept at trial much evidence that has strong elements of untrustworthiness—an obvious example being the testimony of witnesses with a bias. While identification testimony is significant evidence, such testimony is still only evidence, and . . . [c]ounsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification . . . ." (Internal quotation marks omitted.) *Manson* v. *Brathwaite*, 432 U.S. 98, 113 n.14, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

Our Supreme Court has stated that it knows "of no authority which would prohibit, as unduly suggestive,

an exclusively in-court identification. . . . The defendant's protection against the obvious suggestiveness in any courtroom identification confrontation is his right to cross-examination. . . . The innate weakness in any in-court testimonial identification is grounds for assailing its weight rather than its admissibility." (Citations omitted; internal quotation marks omitted.) *State* v. *Smith*, supra, 200 Conn. 470.[7]

In this case, under controlling legal principles, the adversarial system functioned to protect the defendant as to the reliability of Weibel's in-court identifications. Defense counsel had an opportunity to cross-examine him and point out the fact that he could not identify the defendant in a photographic array prepared by the police. During his final argument, defense counsel unsurprisingly highlighted the suggestive nature of Weibel's in-court identification. He stated in that regard: "And then you have an identification in this courtroom. My client is sitting here, next to me, the only other black man in this courtroom is a court marshal with a uniform. And Mr. Weibel is sitting here looking at a group. Is there a surprise on who you're going to select? It's practically a neon light pointed to the gentleman seated next to his lawyer."

Moreover, there was other evidence identifying the defendant as the man who shot Weibel. Lyles testified that the defendant participated in the robbery, that he was armed with a .38 special, and that Weibel remained behind after he and Reyes fled Terrace Circle. In addition, Lyles testified that the defendant told him that he shot Weibel because the conspirators did not get any money. Weibel's in-court identification, therefore, was not the only evidence identifying the man who shot him.[8]

For the foregoing reasons, the defendant's claim that the court abused its discretion by admitting Weibel's in-court identification fails.

## II

The defendant's second claim is that the court abused its discretion by denying his motion for a mistrial due to juror misconduct.[9] We disagree.

The following facts are relevant to our resolution of this claim. The jury commenced deliberations on September 10, 2012. On September 14, 2012, after the luncheon recess, the court informed both counsel in chambers that it had received a message from a lawyer with no connection with the case. The lawyer reported to the court that he had received an e-mail from someone whom he believed was sitting on a criminal jury. The e-mail to the lawyer stated: "If someone were shooting a .38 special, is it possible to shoot two rounds by accident?" The e-mail address of the sender contained the name Stacy, which was the name of one of the jurors. The lawyer informed the court that he had not

responded to the e-mail. The court informed counsel because a .38 special was involved in this case, it intended to question the jurors.

The court then addressed the jury panel, stating: "I received a communication from an attorney reporting that he received an e-mail from someone who was sitting on a criminal jury . . . . So, I have to inquire as to whether or not that has occurred. If so, just what the communications were. So, please stop your deliberations at this time. And we'll go in order in which the jurors were selected. But in the meantime, could you all step into the jury room. And you'll come out one by one."

The first three jurors stated that they had not sent an e-mail to anyone about the case and that they had discussed the case only with the other jurors. Stacy is the name of juror four. The court informed her of the name of the lawyer from whom it had received the message concerning a .38 special. Juror four acknowledged that the address on the e-mail was hers, but she informed the court that anyone in her household can use that address. She stated that she did not send the message inquiring about the .38 special. Juror four also stated that she had not spoken to a nonjuror about the case or let a nonjuror speak to her about it. The court questioned her further about the message from the lawyer whom the court identified by name.[10] Juror four responded: "My boys have access to my e-mail. And they know [the lawyer] as well. And he talks to them often about all kinds of firearms and has promised to take them to the shooting range." Juror four then returned to the jury room. The remaining two jurors indicated that they had not sent any e-mails concerning the case and had not communicated with a nonjuror about it.

The court heard from counsel. The prosecutor suggested that the court question juror four at greater length about the age of her children, the nature of their relationship with the lawyer, and their interest in firearms. In the alternative, the prosecutor requested that juror four be replaced by an alternate juror. Defense counsel agreed with the prosecutor that juror four needed to be removed from the case but not replaced with an alternate juror. Defense counsel asked the court to declare a mistrial. The court then conferred with counsel in chambers.

When court reconvened, the court stated that an e-mail left the household of juror four and was sent to a lawyer, who did not respond to it. Although a message was sent from juror four's household, no message was received in reply. The court concluded, therefore, that the jury had not received any material other than what was in evidence and that the jury would continue its deliberations. Defense counsel requested that the court inquire further of juror four to provide a more complete

record for review on appeal. The court agreed.

The court again inquired of juror four individually. She responded that her children at home were, at the time, fourteen and fifteen years old. When she arrived home the prior day, her fifteen year old had been using her computer to print his school work, which he obtains through her Gmail account. She denied having discussed the case with her children, despite an e-mail asking about a .38 special having been sent from her household.

The court then addressed all of the jurors, stating, "it appears to me that an e-mail left one of the jurors' homes and went to someone. And that person received it, did not respond back. But it's important that we do not communicate to anyone except the jurors. And you don't let anyone communicate to you about the case. You decide the case solely on the material that was presented here in this courtroom while court was in session." The court then excused the jury to continue its deliberations. The court clarified its ruling at the request of the prosecutor, stating, "There was no taint. No information was received by the juror, and the juror's mind was not molded by discussion of others."

"Jury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution. . . . In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. . . . The modern jury is regarded as an institution in our justice system that determines the case solely on the basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court. . . . Consideration [by the jury] of extrinsic evidence is presumptively prejudicial because it implicates the defendant's constitutional right to a fair trial before an impartial jury." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Brown*, 235 Conn. 502, 522–23, 668 A.2d 1288 (1995).

The trial court has broad discretion to determine the form and scope of the proper response to allegations of juror misconduct. Id., 523. On appeal, an appellate court's role is to consider "whether the trial court's review of alleged jury misconduct can fairly be characterized as an abuse of its discretion. . . . Even with this circumscribed role, we have reserved the right to find an abuse of discretion in the highly unusual case in which such an abuse has occurred." Id., 524.

Our Supreme Court has held that "a trial court is required to conduct a preliminary inquiry, on the record, whenever it is presented with information tending to indicate the possibility of juror misconduct or partiality." (Internal quotation marks omitted.) *State* v. *Mer-*

*riam*, 264 Conn. 617, 672, 835 A.2d 895 (2003). "Any assessment of the form and scope of the inquiry that a trial court must undertake when it is presented with allegations of jur[or] [bias or] misconduct will necessarily be fact specific. No one factor is determinative as to the proper form and scope of a proceeding. It is the trial court that must, in the exercise of its discretion, weigh the relevant factors and determine the proper balance between them. . . . Consequently, the trial court has wide latitude in fashioning the proper response to allegations of juror bias." (Internal quotation marks omitted.) Id., 673.

In the present case, the court conducted an inquiry when it learned that an e-mail had been sent from the account of one of the jurors regarding a .38 special by questioning each member of the jury individually. The inquiry revealed that the subject e-mail came from the e-mail account of juror four. This court does not make credibility determinations, but any observer would find it difficult to believe juror four's denial that she did not send the e-mail or discuss the case with her sons under the circumstances. The content of the e-mail was evidence specific.

On appeal, the defendant argues that the trial court's failure to conduct a more extensive inquiry by taking testimony from juror four's children and the lawyer to determine what conversations they may have had with juror four concerning the trial was an abuse of its discretion. We disagree. Whether juror four was truthful, however, is not the critical fact. The court did not deny the defendant's request for a mistrial on the basis of her credibility. The defendant has not challenged the court's finding that the lawyer did not respond to the e-mail. The court concluded that the jury had not been tainted because the lawyer did not respond. There was no information before the jury other than the evidence presented at trial.

To prevail on a claim of juror misconduct, a defendant "must raise his contention of bias from the realm of speculation to the realm of fact." (Internal quotation marks omitted.) *State* v. *Mukhtaar*, 253 Conn. 280, 297, 750 A.2d 1059 (2000). When the "court is in no way responsible for the alleged juror misconduct, the defendant bears the burden of proving that the misconduct actually occurred *and* resulted in actual prejudice." (Emphasis added.) *State* v. *Feliciano*, 256 Conn. 429, 449, 778 A.2d 812 (2001). The defendant here has not demonstrated that any information that was not in evidence came before the jury. Irrespective of whether another judge may have resolved the matter differently, we conclude that the court did not abuse its discretion when it denied the defendant's request to declare a mistrial.

III

The defendant also claims that the court abused its discretion by denying his request to charge the jury that he is "presumed to be not guilty," rather than presumed "to be innocent." We do not agree.

The defendant submitted a request to charge in which he asked the court to charge the jury that he is presumed "to be not guilty," rather than presumed "to be innocent."[11] Following the court's on the record charging conference, the defendant renewed his request. The court stated, "[n]o," and that its charge tracked what the Judicial Branch recommends with respect to the presumption of innocence. The court instructed the jury pursuant to the charge presented during the charging conference.[12]

"[A] claim of instructional impropriety regarding the presumption of innocence . . . is of constitutional magnitude." *State* v. *Lawrence*, 282 Conn. 141, 178 n.22, 920 A.2d 236 (2007). "The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." (Internal quotation marks omitted.) *Taylor* v. *Kentucky*, 436 U.S. 478, 483, 98 S. Ct. 1930, 56 L. Ed. 2d 468 (1978).

The standard of review of a claim of instructional impropriety is well known. "The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Internal quotation marks omitted.) *State* v. *Lavigne*, 307 Conn. 592, 599–600, 57 A.3d 332 (2012).

The substance of the defendant's claim is that the term "presumption of innocence" means that the defendant did not do that with which he is charged. He posits that "presumed not guilty" means that the defendant may have done that with which he is charged, but the state did not prove its case. The state has countered that the defendant's preference actually provides him with less protection than that guaranteed by the sixth amendment.

"[I]n a criminal case the term [presumption of innocence] does convey a special and perhaps useful hint over and above the other form of the rule about the

burden of proof, in that it cautions the jury to put away from their minds all the suspicion that arises from the arrest, the indictment, and the arraignment, and to reach their conclusion solely from the legal evidence adduced. In other words, the rule about burden of proof requires the prosecution by evidence to convince the jury of the accused's guilt; while the presumption of innocence, too, requires this, but conveys for the jury a special and additional caution (which is perhaps only an implied corollary to the other) to consider, in the material for their belief, *nothing but the evidence, i.e.*, no surmises based on the present situation of the accused." (Emphasis in original; internal quotation marks omitted.) *Taylor* v. *Kentucky*, supra, 436 U.S. 484–85.

On the basis of our review of the court's charge, we conclude that it was correct in law, adapted to the issues and provided ample guidance to the jury. We can conceive of no way in which the jury was misled. The court, therefore, did not abuse its discretion by charging the jury with the words "the defendant is presumed to be innocent."

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Lyles was a cooperating witness who had negotiated a plea agreement in exchange for his testimony.

[2] Lyles testified that he previously had used a similar Craigslist ruse to rob others.

[3] At trial, Weibel described all three men as being African-American and "pretty small," smaller than he.

[4] Shaw also was not able to identify the defendant.

[5] The defendant framed the claim as follows: "The trial court abused its discretion by either refusing to preclude the inherently and highly suggestive in-court identification of the defendant, or in the alternative, by refusing the defendant's timely and reasonable requests for alternative identification procedures so as to avoid the unnecessarily suggestive identification that ultimately violated the defendant's due process rights under both the federal and Connecticut constitutions."

Although the defendant alleges violations of both the state and federal constitutions, he has not provided a separate analysis of the claim under our state constitution. Generally, this court considers unanalyzed claims to be abandoned. See *State* v. *Garcia*, 108 Conn. App. 533, 541 n.3, 949 A.2d 499, cert. denied, 289 Conn. 916, 957 A.2d 880 (2008). In this case, that failure is of no consequence, as the state points out that "article first, § 8, provides no greater protection than the federal constitution in the realm of identification procedures." *State* v. *Marquez*, 291 Conn. 122, 135, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009).

[6] During his final argument, defense counsel suggested that Lyles was not telling the truth about the defendant in order to get a good deal with the state. The state responded that Lyles testified to having used the Craigslist scheme on several occasions prior to January 9, 2010, and he did not implicate the defendant in those robberies.

[7] Although our Supreme Court has stated that it knows of no authority that would prohibit unduly suggestive in-court identifications, it has not yet reexamined the state of the law with respect to the reliability or accuracy of eyewitness, in-court identifications in view of the scientific advances in that area, which have called into question many previously prevalent assumptions in eyewitness identification cases. See *State* v. *Guilbert*, 306 Conn. 218, 49 A.3d 705 (2012) (expert testimony as to factors that generally have adverse effect on reliability of eyewitness identification admissible; multiple factors affect eyewitness ability to recollect and identify perpetrator of crime, particularly crimes of cross-racial nature).

[8] We also note that the court gave the jury a detailed charge with respect

to eyewitness identification, which follows: "You must decide how much weight to place on Mr. Weibel's identification testimony. In appraising his testimony you should take into account whether Mr. Weibel had adequate opportunity and ability to observe the perpetrator on the date in question. This will be affected by such considerations as length of time available to make the observation, the distance between the witness and perpetrator, the lighting conditions at the time of the offense, whether the witness had known or seen the person at an earlier occasion, any history between them, if any, whether anything distracted the attention of the witness during the incident. You should also consider the witness' physical and emotional condition at the time of the—confrontation and the witness' powers of observation in general. . . .

"You should take into account the circumstances under which the witness first observed and identified the defendant, the suggestibility, if any, of the procedure used in that viewing, physical descriptions that the witness may have given to the police and any other factors which you find that relate to the reliability of the identification of the defendant. You may consider whether the identification witness some time before the trial was shown a photo array that included a photo of the defendant and whether or not he failed to identify the defendant at the time. Picking a defendant out of a group of similar individuals is generally more reliable than a procedure involving the presentation of the defendant alone to a witness."

[9] The defendant framed his second claim as follows: "The trial court erred in denying the defendant's motion for mistrial when, on the evening of the third day of deliberations, an e-mail from a sitting juror's e-mail address was sent from the juror's home to a nonjuror attorney, seeking crucial information concerning a critical aspect of the case under deliberations."

[10] The court explained the message he received from the lawyer. The lawyer wrote: "I discovered this e-mail when I came back . . . . It was sent to my personal e-mail . . . from someone I know who may have been serving on a criminal jury. And I did not feel completely comfortable with the e-mail due to the jury service." The e-mail message from the juror was at the bottom of the lawyer's message.

[11] The defendant's request to charge stated at more length: "In this case, as in all criminal cases, the accused is presumed to be *not guilty until, and only if*, he is proved guilty. That means that at the moment when he was presented before you for trial, he stood before you free of any bias, prejudice or burden arising from his position as the accused . . . ." (Emphasis in original.)

[12] With regard to the presumption of innocence, the charge instructed the jury as follows: "The defendant . . . is presumed to be innocent of each charge. The presumption of innocence remains unless you are satisfied that the evidence considered in light of these instructions establishes the defendant's guilt on the charge beyond a reasonable doubt. The state has the burden of proving beyond a reasonable doubt each essential element of a charge."